[This opinion has been published in *Ohio Official Reports* at 90 Ohio St.3d 403.]

THE STATE OF OHIO, APPELLEE, *v*. JONES, APPELLANT.

[Cite as *State v. Jones*, 2000-Ohio-187.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-1891—Submitted July 25, 2000—Decided December 27, 2000.)

APPEAL from the Court of Appeals for Hamilton County, No. C-970043.

———————————

{¶ 1} During the early afternoon of Friday, September 2, 1994, Elaine Schub and Joe Kaplan checked in as guests at the Embassy Suites Hotel in Blue Ash. Schub was in town to see her grandson's bar mitzvah, which was to be held the following day. Schub's best friend, Rhoda Nathan, flew in from New Jersey later that afternoon also to attend the event on Saturday. Schub and Nathan shared the bedroom of the hotel suite, while Kaplan stayed in the front room using a foldout bed.

{¶ 2} On Saturday morning, September 3, Schub and Kaplan awoke early to meet relatives at the complimentary breakfast served on the first floor of the hotel. As she and Kaplan left the room at approximately 7:28 a.m., Schub told Nathan to go back to sleep, since she did not need to be at the temple that morning as early as the family. Kaplan had the only room key for the group and made sure the door was locked when he and Schub left for breakfast.

{¶ 3} At approximately 8:08 a.m., Schub and Kaplan finished breakfast and returned upstairs to their room. Kaplan unlocked the door and discovered Nathan lying nude on the floor. Employees and hotel guests rushed up to Room 237, where Schub was found screaming and shaking. A cardiologist, a respiratory therapist, and a nurse happened to be at the hotel at the time, and they came to the room to help resuscitate Nathan.

{¶ 4} Initially, witnesses thought Nathan had had a fall, perhaps brought on by a heart attack, since there seemed to be little blood on or around Nathan. However, further investigation revealed that Nathan's hair was soaked with blood and that she had suffered severe trauma to her head. When Nathan's head was moved, witnesses found a tooth on the floor. Later, Schub asked for and was given her purse, which she had left in the hotel room during breakfast. Upon opening her wallet, which was inside the purse, Schub noticed that money was missing.

{¶ 5} During the commotion, Schub noticed that Nathan no longer had the pendant necklace that she had been wearing earlier and that she always wore. The pendant was a one-of-a-kind piece of jewelry that Nathan's late husband had made from his mother's wedding band. It consisted of several connected gold bars, one containing diamonds. According to Nathan's daughter-in-law, Nathan never took the pendant off. Nathan died that afternoon as a result of multiple traumas to her head and body. The coroner's office determined that the death was a homicide.

{¶ 6} Police quickly set up a command center in a banquet room on the second floor near the murder scene in Room 237. Police canvassed the rooms at the hotel and took statements from guests and hotel employees working that day. Police then began to concentrate their investigation on three particular hotel employees who had prior criminal histories. Police cleared two of the employees through further investigation and narrowed their investigation to defendant-appellant, Elwood "Butch" Jones. Police discovered from interviews with other hotel employees that appellant had injured his hand on the day Nathan was killed. This fact pointed to appellant as a suspect because the crime at the hotel involved a violent assault. Appellant had filed a claim for workers' compensation for medical benefits. The police thereafter subpoenaed and received the medical records for the treatment of appellant's hand injury.

{¶ 7} On September 12, 1994, Sgt. Robert Lilley of the Blue Ash Police Department spoke with one of appellant's treating physicians, Dr. John

2

McDonough. Lilley learned through another police investigator that Dr. McDonough had classified appellant's injury as a fist-to-mouth injury and that Dr. McDonough had asked appellant if he received the injury by punching someone in the mouth. That same day, police went to the residence of Earlene Metcalfe in Loveland. Metcalfe worked at the hotel and was a girlfriend of appellant, in addition to being listed as a witness to appellant's hand injury on his workers' compensation claim form. Upon arriving at Metcalfe's residence, police found appellant there, and both he and Metcalfe voluntarily agreed to answer questions at the Blue Ash Police station concerning the homicide at the hotel.

{¶ 8} At the police station, appellant was advised of his *Miranda* rights and signed a waiver form. During the interview with Sgt. Lilley and Blue Ash Police Officer Larry Stokes, appellant stated that he and Metcalfe arrived at the hotel on September 3 at approximately 5:00 a.m. At that time, appellant signed out a hotel master key at the front desk as he did every day at work. Since appellant was not due to clean the hotel banquet rooms until 10:00 a.m., he began to help Metcalfe set up the complimentary breakfast area. Shortly after 6:00 a.m., appellant learned that a coworker would not be in to work that morning, so he went to the second floor of the hotel to begin cleaning the banquet rooms. Appellant stated that at around that time, he slipped on steps outside the hotel and fell, cutting his left hand while taking trash out to the hotel dumpster. He then finished cleaning the Maple banquet room and went downstairs to help with the hotel's complimentary breakfast.

{¶ 9} According to Lilley, appellant was forceful and almost defensive when he claimed that he worked at the breakfast from approximately 6:30 a.m. to 8:00 a.m. that day. Appellant further claimed that he was cleaning tables in the restaurant dining area when he heard screams from the second floor as well as a trouble call over a coworker's employer-provided walkie-talkie.

{¶ 10} Appellant told Lilley that he again hurt his hand in a banquet room later that day and that he really thought nothing more of the injury until it started bothering him several days later on September 6. Appellant reiterated that he never left the restaurant on September 3 between 6:30 and 8:00 a.m. and asserted that he was never inside Room 237, since he had no reason to be in any of the guest rooms at the hotel. Lilley asked if he was involved in the murder, and appellant declared that he wanted to talk to an attorney before he answered any more questions. At that point, the interview ceased.

{¶ 11} The police secured Metcalfe's consent to search her residence and also obtained a warrant to search a vehicle owned by appellant, which was parked in Metcalfe's driveway in Loveland. In addition, police obtained a search warrant for appellant's residence on Morman Avenue in Cincinnati. While police seized many items of apparel from the two residences, none of them yielded any trace evidence of blood. However, the search of appellant's car produced several items of evidence. Inside the toolbox in the trunk of appellant's car was the unique pendant belonging to Nathan. Also recovered from the toolbox was a master key to the hotel, which could open Room 237, where the murder took place. Police also recovered door security chains, which were later used in attempting to match marks on Nathan's body found on autopsy photos.

{¶ 12} The last test results on the seized items came back in August 1995, and the case was later submitted to the grand jury. On September 27, 1995, the grand jury indicted appellant on two counts of aggravated felony-murder (during an aggravated burglary and during an aggravated robbery), and separate counts of aggravated burglary and aggravated robbery. Death-penalty specifications attached to each aggravated murder count alleged that appellant was the principal offender in the aggravated murder during a burglary and the principal offender in the aggravated murder during a robbery or committed the offenses with prior calculation and design. Ultimately the prosecution proceeded only on the first

4

alternative, that appellant was the principal offender. R.C. 2929.04(A)(7). Police arrested appellant at his place of employment in downtown Cincinnati later that day and took him to the District 1 police station for processing.

{¶ 13} While at the District 1 headquarters, appellant was shown a copy of the indictment and told he was under arrest for the murder of Rhoda Nathan, as well as for burglary and the robbery involving her pendant necklace. At that point, appellant inquired, "What necklace?" Sgt. Lilley then produced a photo sheet of the pendant recovered from appellant's car and placed it on the table. Appellant then stated that he had never seen it before in his life. Sgt. Lilley told appellant that the pendant had been recovered from the trunk of his car. Appellant declared, "Not in my fucking car."

{¶ 14} A jury trial was held wherein numerous witnesses were called by both the prosecution and defense. Among the prosecution witnesses was Dr. John McDonough, who was appellant's physician during his hand surgery. Dr. McDonough testified that he took a culture from the wound in appellant's left hand and that testing indicated a "mixed flora" of organisms. One of the organisms detected was *eikenella corrodens*, an organism usually found in dental plaque, which Dr. McDonough described as extremely rare in hand injuries. Dr. McDonough testified that, within a reasonable degree of medical certainty, the infection to appellant's hand was caused by a fist-to-mouth injury because of the presence of *eikenella corrodens*. This type of injury is sometimes referred to as a "fight bite." The defense put into evidence the testimony of an expert, Dr. Joseph Solomkin, who questioned the likelihood of Dr. McDonough's conclusion. Dr. Solomkin testified that it was possible that the *eikenella corrodens* had come from some source other than an assault victim's mouth.

{¶ 15} After deliberation, the jury found appellant guilty as charged.

{¶ 16} At the mitigation hearing, appellant maintained his innocence and refused to allow defense counsel to present any mitigation witnesses. Appellant

permitted counsel to argue only residual doubt on his behalf at the mitigation hearing. The trial judge specifically asked, "Mr. Jones, is that accurate, sir?" Appellant replied, "Yes, it is, Your Honor."

{¶ 17} The defense requested an instruction on residual doubt, but the court refused to instruct based on *State v. Garner* (1995), 74 Ohio St.3d 49, 56-57, 656 N.E.2d 623, 632, which held that a defendant is not entitled to an instruction identifying residual doubt as a mitigating factor.

{¶ 18} The jury recommended death, and the court adopted the jury's death-sentence recommendation. At his sentencing hearing, appellant indicated that he twice refused to plead guilty to a charge of manslaughter and that he did not kill Nathan.

{¶ 19} Upon appeal, the court of appeals affirmed the convictions and death sentence.

{¶ 20} The cause is now before this court upon an appeal as of right.

———————————

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.,* Assistant Prosecuting Attorney, for appellee.

*Elizabeth E. Agar* and *Roxann H. Dieffenbach,* for appellant.

———————————

**ALICE ROBIE RESNICK, J.**

{¶ 21} Appellant, Elwood Jones, has raised twenty-six propositions of law. We have reviewed each and have determined that none justifies reversal of appellant's conviction for aggravated murder. Pursuant to R.C. 2929.05(A), we have also independently weighed the aggravating circumstances against the mitigation evidence, and reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm appellant's conviction and death sentence.

INEFFECTIVE ASSISTANCE

{¶ 22} In his first four propositions of law, appellant contends that trial counsel provided ineffective representation, thereby depriving him of a fair trial in both phases. Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

*Failure to Assert Physician-Patient Privilege*

{¶ 23} In his first proposition of law, appellant argues that trial counsel were ineffective in failing to object to or prevent testimony protected by the physician-patient privilege of R.C. 2317.02(B). Appellant contends that his trial counsel simply missed the issue of physician-patient privilege and that his trial counsel never deliberately made a tactical decision not to raise the issue.

{¶ 24} During trial, the prosecution called Dr. John McDonough to testify concerning appellant's hand injury. This testimony was incriminating to appellant, since other evidence elicited at trial revealed that Nathan was struck in the face with a "considerable amount of force" that broke her jaw. One of Nathan's teeth was found in her stomach during the autopsy. Another tooth was found under Nathan's head on the hotel room floor. Dr. McDonough concluded that appellant's injury to his hand was a fist-to-mouth injury due to the presence of the *eikenella corrodens* organism found almost always in dental plaque. This evidence was a key component of the state's circumstantial case against appellant and pointed to him as the killer. The other key component was the discovery of Nathan's pendant in the toolbox in the trunk of appellant's car.

{¶ 25} Although defense counsel lodged several objections during Dr. McDonough's testimony, none of these objections attempted to assert the physician-patient privilege. Nor did defense counsel file a motion *in limine* to

prevent Dr. McDonough's testimony or to prevent use of appellant's medical records. In addition, defense counsel did not file a motion to quash the subpoena requesting appellant's medical records. If defense counsel had used one of these avenues to assert the physician-patient privilege, the issue would have been directly before the trial court, and the trial court would have ruled on the applicability of the privilege. Since no issue regarding the physician-patient privilege was raised at trial, we must consider the question in the context of ineffective assistance of counsel.

{¶ 26} We find that trial counsel were not ineffective in failing to raise the issue of physician-patient privilege, because we determine that the privilege was inapplicable in the circumstances of this case. For the following reasons, even if counsel had objected to Dr. McDonough's testimony, the trial court would have been required to overrule the objection and allow Dr. McDonough to testify.

{¶ 27} R.C. 2921.22(B) requires that physicians and certain others giving aid to an injured person report to law enforcement personnel gunshot or stab wounds and further requires reporting "any serious physical harm to persons that the physician * * * knows or has reasonable cause to believe resulted from an offense of violence."

{¶ 28} The statute applies here even though Dr. McDonough did not report the injury. Dr. McDonough suspected that the injury was a fist-to-mouth injury when tests revealed the presence of the *eikenella corrodens*, and he questioned appellant's version of how he received the injury. Dr. McDonough's opinion of a fist-to-mouth injury was substantiated when the police contacted him with the information that appellant was a suspect in the murder investigation. At that point, Dr. McDonough's suspicions about the injury and the police information conveyed to him coalesced to support his belief that the injury was caused by an offense of violence. If Dr. McDonough had learned that appellant was a suspect from a source other than the police (*e.g.*, a news report), he would have been required to report

the injury pursuant to R.C. 2921.22, given his personal suspicions about the nature of the injury. As it was, he was already in contact with the police, so the reporting was no longer required. The situation is no different than if Dr. McDonough had reported appellant's injury on his own initiative.

{¶ 29} Appellant urges that, even assuming that Dr. McDonough had a duty to report the injury under R.C. 2921.22(B), there is a further question of whether the statute leads to waiver of the physician-patient privilege. Appellant argues that the privilege remains intact even if the injury is reported to the police.

{¶ 30} In *State v. Antill* (1964), 176 Ohio St. 61, 26 O.O.2d 366, 197 N.E.2d 548, paragraph four of the syllabus, this court, in considering the predecessor statute to R.C. 2921.22(B), held, "Where a physician is required by [the former statute] to report to a law-enforcement officer a gunshot wound or wound inflicted by a deadly weapon, the former may testify, without violating the physician-patient privilege, as to the description of the wounded person, as to his name and address, if known, and as to the description of the nature and location of such wound, obtained by examination, observation and treatment of the victim."

{¶ 31} We see no reason to distinguish between a report of a "gunshot wound or wound inflicted by a deadly weapon" as specified in *Antill* and a report of "serious physical harm" pursuant to R.C. 2921.22 at issue in the present case. The policies implicated in the statutory duties to report are identical in the two situations. If the details of the wound have already been reported, "[t]he only purpose that sustaining the privilege can now serve is to obstruct the course of justice." *Antill*, 176 Ohio St. at 65, 26 O.O.2d at 368, 197 N.E.2d at 552. We find that the holding of *Antill* is applicable to the situation in the instant case.

{¶ 32} Appellant argues that in *State v. Smorgala* (1990), 50 Ohio St.3d 222, 553 N.E.2d 672, this court established that there is no public policy exception to the privilege statute regarding evidence sought by the state in criminal prosecutions. Appellant's citation of *Smorgala* is inapposite. In that case, this court

held at paragraph one of the syllabus that "[c]ourts may not create a public policy limitation upon the physician-patient privilege in order to allow otherwise clearly inadmissible evidence to be received in drunk driving cases." The situation in the case at bar, and in *Antill*, is different from that in *Smorgala*, where a judicially created policy limiting the physician-patient privilege was found inapplicable because it conflicted with the statute giving rise to the privilege, R.C. 2317.02(B). At issue instead in the instant case, as in *Antill*, is the interplay of two statutes, the physician-patient privilege statute, R.C. 2317.02(B), and the medical personnel reporting statute, now R.C. 2921.22(B). In this case we are dealing with a statute, R.C. 2921.22, not *judicially* created policy; hence, the rule of *Smorgala* is not implicated.

{¶ 33} Our conclusion is bolstered by the Legislative Service Commission 1973 comment to Am.Sub.H.B. No. 511. The portion of R.C. 2921.22(B) at issue in this case—the requirement that medical personnel report "serious physical harm" when they know or have reasonable cause to believe the harm resulted from an offense of violence—is essentially unchanged from the 1972 enactment of R.C. 2921.22(B). See Am.Sub.H.B. No. 511, 134 Ohio Laws, Part II, 1951. The 1973 comment to H.B. No. 511 provides:

"This section also requires doctors * * *, and others who give aid to the sick or injured, to report gunshot and stab wounds, and other serious injuries which they know or have reasonable cause to believe resulted from a crime of violence, such as the 'battered child syndrome.' The reporting requirement under this part of the section is absolute, i.e., no privilege attaches in the cases covered."

{¶ 34} Even if appellant's counsel had raised the physician-patient privilege, they would not have been successful. Appellant's trial counsel, therefore, were not deficient in failing to raise the physician-patient privilege as an issue. The requirements of *Strickland* are not met. Appellant's first proposition is overruled.

*Failure to Object*

{¶ 35} Under his second proposition of law, appellant asserts ineffective assistance where trial counsel failed to interpose a specific objection to the admission of statements made to police after appellant invoked his right to counsel. In particular, appellant complains that counsel failed to raise the issue of "constructive interrogation" concerning statements he made at District 1 headquarters after his arrest.

{¶ 36} This proposition lacks merit. Appellant concedes that counsel filed a motion to suppress statements that he made to police on three different occasions. In fact, a suppression hearing was held, at the close of which the court ruled that all statements made by appellant, both before and after his arrest, were voluntary. Even assuming counsel could have raised the issue of constructive interrogation more specifically, there is no reasonable probability that the result of the trial would have been different but for counsel's errors. *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. There was no interrogation, constructive or otherwise, after appellant was arrested and booked at District 1 headquarters. Moreover, the statements made by appellant were at worst only marginally incriminating. See *Rhode Island v. Innis* (1980), 446 U.S. 291, 298-302, 100 S.Ct. 1682, 1688-1690, 64 L.Ed.2d 297, 306-308, construing the meaning of "interrogation" for purposes of *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Accordingly, we find appellant's second proposition is not well taken.

*Failure to Rehabilitate Jurors*

**{¶ 37}** In his third proposition of law, appellant contends that counsel failed to attempt rehabilitation of jurors who opposed the death penalty during voir dire. Appellant also asserts that counsel failed to challenge for cause a juror (Hamilton), who admitted that he might be unable to put aside his experience as a police officer and objectively consider the evidence presented. Appellant's claims of ineffective assistance in this context are unfounded.

**{¶ 38}** Appellant cites six jurors whom counsel should have rehabilitated: Chavez, Noe, Cripe, Baker, Brooks, and Cook. However, voir dire revealed that all were unalterably opposed to the death penalty and that their strong views "would prevent or substantially impair the performance" of their duties as jurors. See *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. Moreover, the failure to probe views of jurors who were excused for cause under death qualification, does not constitute ineffective assistance, since trial counsel is in a better position to determine if jurors can be rehabilitated. *Bradley,* 42 Ohio St.3d at 143, 538 N.E.2d at 381.

**{¶ 39}** With respect to the failure to challenge Juror Hamilton for cause, the transcript reveals no ground that counsel could have successfully asserted as a challenge. Hamilton indicated that he would follow the law: "I may not agree with it but it's my job and I have to do it." Therefore, we overrule appellant's third proposition.

*Failure to Present Mitigating Evidence*

**{¶ 40}** In his fourth proposition of law, appellant alleges ineffective assistance based on counsel's failure to present available mitigation evidence. At the beginning of the mitigation hearing, defense counsel informed the court that appellant had always maintained he was innocent in the murder of Nathan and that the only mitigation he wanted counsel to present was residual doubt. The trial judge specifically asked appellant if that was accurate, and appellant replied, "Yes, it is,

Your Honor." On the second day of the mitigation hearing, the court informed the defense that it would not instruct the jury on residual doubt based on the decision in *Garner*, 74 Ohio St.3d at 56-57, 656 N.E.2d at 632.

{¶ 41} As we noted recently in *State v. Ashworth* (1999), 85 Ohio St.3d 56, 63, 706 N.E.2d 1231, 1238, even if the court attempted to require an attorney to present mitigating evidence, it cannot force an unwilling defendant to provide that evidence to his attorney. Moreover, where the defendant does not want to present mitigating evidence, no societal interest counterbalances the defendant's right to control his own defense. *State v. Tyler* (1990), 50 Ohio St.3d 24, 28, 553 N.E.2d 576, 584.

{¶ 42} Here, nothing suggests that appellant was not competent to forgo presenting any mitigating evidence. Nor did appellant ever indicate a change of heart after the court's refusal to instruct on residual doubt. In fact, at his sentencing hearing appellant again maintained his innocence and indicated that he had twice refused to accept a plea bargain on manslaughter. In light of all the foregoing, counsel were not ineffective for failing to present available mitigating evidence. We overrule appellant's fourth proposition.

VOIR DIRE/PRETRIAL ISSUES

*Suppression Issues*

{¶ 43} In his eleventh proposition of law, appellant complains that the affidavit of Officer Stokes in support of the warrant to search appellant's vehicle contained material misstatements of fact. Consequently, appellant submits that the warrant was invalid and that evidence seized pursuant to the warrant should have been suppressed. In particular, appellant contends that Stokes grossly misstated his experience in the affidavit, because the Nathan murder case was his first homicide investigation. In addition, appellant asserts that police "had no reason to believe they would find bloody clothes or traces of blood on Defendant's clothing or possessions."

**{¶ 44}** In the affidavit supporting the request for a warrant, Officer Stokes stated:

"The affiant is a trained and experienced police officer who knows through his training and experience that when a victim is beaten as badly as Nathan was in this offense, there will be a transfer of blood from the victim to the assailant, and a transfer of that blood from the assailant to items in a vehicle or a residence that he would come in contact with."

**{¶ 45}** Contrary to appellant's assertions, the above paragraph does not constitute a gross misstatement of fact for an officer with twenty years of police experience. Simply because this was Stokes's first homicide investigation does not mean that he would be ignorant of the probability of trace evidence of blood on the clothing or possessions of a murder suspect who allegedly committed a violent assault. In fact, his years of experience would indicate otherwise.

**{¶ 46}** In reviewing a similar claim, we noted that under *Franks v. Delaware* (1978), 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667, 682, an affidavit supporting a warrant enjoys a presumption of validity. *State v. Roberts* (1980), 62 Ohio St.2d 170, 178, 16 O.O.3d 201, 206, 405 N.E.2d 247, 253. In order to overcome the presumption, the defendant has "the task of supporting his allegations by more than conclusional accusations, or the mere desire to cross-examine." *Id*. at 178, 16 O.O.3d at 206, 405 N.E.2d at 253. Although this was Stokes's first homicide investigation, appellant has not shown that Stokes lacked experience in investigating assaults or other crimes where blood was transferred. In addition, appellant does not show that police suspected that trace blood would not appear on appellant's clothing or personal possessions. Appellant's eleventh proposition is not well taken.

**{¶ 47}** In his twelfth proposition of law, appellant argues that statements he made on the day he was arrested, after he invoked his right to counsel, should have been suppressed.

**{¶ 48}** During the suppression hearing, Officer Stokes testified that when appellant was being booked at the District 1 headquarters in Cincinnati after his arrest, appellant asked Sgt. Lilley: "What's going on? What am I being charged with?" Lilley responded: "You're charged with aggravated murder of Rhoda Nathan, the aggravated burglary of Rhoda Nathan's room." Appellant then asked Lilley: "What burglary, what theft are you talking about?" Lilley then placed a photo of the pendant on the desk in front of appellant. Appellant then asked: "What necklace?" Appellant looked at the photo and claimed that he had never seen it before in his life. Lilley then stated: "It was in the trunk of your car." Appellant then denied it had been in his car. The conversation between appellant and the police ceased. The trial court ruled that appellant's statements were voluntarily given.

**{¶ 49}** The police advised appellant of his *Miranda* rights during the voluntary questioning on September 12, 1994, at the close of which he declared he wanted an attorney, and on the day of his arrest on September 27, 1995. Sgt. Lilley acknowledged at the suppression hearing that the police knew they could not interrogate appellant on the day he was arrested, since he had previously invoked his rights to remain silent and to obtain counsel a year earlier.

**{¶ 50}** At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, 982, citing *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 58, 437 N.E.2d 583, 584. See, also, *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus; *State v. DePew* (1988), 38 Ohio St.3d 275, 277, 528 N.E.2d 542, 547. Here, appellant initiated the conversation by asking the police what he was being charged with. Appellant was not asked any questions. Therefore, the trial court could legitimately conclude that appellant's statements to police after he was arrested were not the result of a police interrogation, but were voluntary and not elicited in

violation of his constitutional rights. See *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1045-1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405, 412-413 (plurality opinion), construing *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. Even assuming error in the admission of appellant's statements, we find that any error was harmless. See *State v. Richey* (1992), 64 Ohio St.3d 353, 361, 595 N.E.2d 915, 923. Appellant's twelfth proposition is overruled.

*Voir Dire Issues*

{¶ 51} In his nineteenth proposition of law, appellant contends that the systematic exclusion of jurors opposed to the death penalty violated his right to a fair and impartial jury. In his twentieth proposition of law, appellant argues that the exclusion of jurors opposed to the death penalty resulted in a jury biased in favor of guilt and of death.

{¶ 52} Appellant's arguments are not well taken. The voir dire transcript reveals that the trial court used the correct standard for death qualification of jurors established in *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. See, *e.g.*, *State v. Wilson* (1996), 74 Ohio St.3d 381, 388, 659 N.E.2d 292, 302. Moreover, the trial judge properly determined that the death-penalty views of those excused "would prevent or substantially impair" their performance of their duties as jurors. *Rogers*, 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. We overrule appellant's nineteenth and twentieth propositions of law.

TRIAL ISSUES

*Admissibility Issues*

{¶ 53} In his ninth proposition of law, appellant asserts that he was prejudiced when the trial court failed to exclude from evidence the portion of the police officer's notes where appellant invoked his right to counsel. Appellant submits that even though the trial court issued a curative instruction, the danger

16

remained that the challenged portion attracted the jury's attention to an improper inference that could be drawn from its admission.

{¶ 54} Clearly, it is improper for evidence to be admitted that a defendant invoked his or her right to counsel. See *Doyle v. Ohio* (1976), 426 U.S. 610, 618-619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91, 98; *State v. Chinn* (1999), 85 Ohio St.3d 548, 560-561, 709 N.E.2d 1166, 1178. However, after the officer testified that appellant wanted to talk to an attorney, the trial court immediately reminded the jury that anyone has the right to invoke the right to counsel. In addition, the court charged the jury that "[appellant] also has a constitutional right to stop talking to the police and request counsel at any time. * * * The fact that he stopped talking to the police and invoked his right to counsel must not be considered for any purpose."

{¶ 55} Juries are presumed to follow the court's instructions, including instructions to disregard testimony. See *State v. Zuern* (1987), 32 Ohio St.3d 56, 61, 512 N.E.2d 585, 590; *State v. Henderson* (1988), 39 Ohio St.3d 24, 33, 528 N.E.2d 1237, 1246; *State v. Loza* (1994), 71 Ohio St.3d 61, 75, 641 N.E.2d 1082, 1100. Any error was rendered harmless by the trial court's curative instructions. We reject appellant's ninth proposition.

{¶ 56} In his tenth proposition of law, appellant raises two arguments concerning the testimony of Dr. McDonough. In the first instance, appellant claims that it was error for the trial court to allow Dr. McDonough to testify as an expert for the state and to offer an expert opinion that appellant's injury was caused by a fist-to-mouth injury due to the presence of *eikenella corrodens*. However, the determination of an expert's qualifications to testify on a particular subject is within the sound discretion of the trial court. *State v. Awkal* (1996), 76 Ohio St.3d 324, 331, 667 N.E.2d 960, 968. Accordingly, any question concerning the admission or exclusion of expert testimony is measured by the abuse-of-discretion standard. See *State v. Bidinost* (1994), 71 Ohio St.3d 449, 453, 644 N.E.2d 318, 322.

{¶ 57} The trial court did not abuse its discretion by permitting Dr. McDonough to testify as an expert on appellant's injury. Dr. McDonough teaches a course at the University of Cincinnati dealing with human bites and infections of the hand caused by bite or fist-to-mouth injuries. While Dr. McDonough does not specialize in infectious diseases, his expertise in the area of clenched-fist or bite injuries to hands made him well qualified to testify on this subject. His lack of expertise in infectious diseases would relate only to the weight of the evidence, not its admissibility. *State v. Jells* (1990), 53 Ohio St.3d 22, 29, 559 N.E.2d 464, 471. Moreover, we believe that such testimony is properly admitted where the expert merely observed the medical procedure and testified as to its results. See *State v. Eley* (1996), 77 Ohio St.3d 174, 181, 672 N.E.2d 640, 648-649.

{¶ 58} In the second instance, appellant claims that the trial court erred in overruling defense counsel's objection to Dr. McDonough's testimony derived from appellant's medical records. Under this argument, appellant asserts that since Dr. Cherney prepared the medical records in issue, Dr. McDonough should not have been allowed to testify as to their contents, since the records themselves were never admitted into evidence and Dr. McDonough had no personal knowledge of the matters discussed by Dr. Cherney with appellant. *State v. Chapin* (1981), 67 Ohio St.2d 437, 442, 21 O.O.3d 273, 277, 424 N.E.2d 317, 321. Although Dr. Cherney prepared the medical reports, Dr. McDonough supervised the surgery of appellant's hand and signed the reports prepared by Dr. Cherney. Moreover, Dr. McDonough was personally involved in the treatment and diagnosis of appellant's hand injury. The trial court did not err in permitting Dr. McDonough to testify as to the contents of appellant's medical reports, since the reports reflected matters within his personal knowledge. Appellant's tenth proposition is overruled.

{¶ 59} Under his thirteenth proposition of law, appellant complains that the trial court erred in admitting expert opinion testimony concerning the correlation between wound patterns on the victim's body and the shape of objects allegedly

used in the murder of Nathan. Appellant asserts that the expert opinion testimony of FBI specialist William J. Stokes and Dr. William Oliver of the Armed Forces Institute of Pathology was not based upon widely accepted knowledge, facts, and principles, in violation of Evid.R. 702(C)(1).

{¶ 60} In his video deposition, FBI specialist Stokes testified that he used a "rectifying enlarger," the only one he knew of being used for forensic photography, to correct the plane of the reference scale on autopsy photos of Rhoda Nathan. Stokes explained that the scale on the autopsy photos was not on the same level as the wounds on the victim's body. The rectifying enlarger compensates for perspective by making the wounds on the different plane properly match the scale that is on the autopsy photos. Stokes used State Exhibit 6, a walkie-talkie available to appellant while he was working at the hotel, to help establish the scale of the wounds on the autopsy photo. Stokes then opined that the characteristics of the radio matched up with certain wounds on Nathan's body depicted on State Exhibit 5.

{¶ 61} Lieutenant Colonel William Oliver, a medical doctor and forensic pathologist with the Armed Forces Institute of Pathology, also testified in a video deposition. Dr. Oliver was provided autopsy photos of Nathan to evaluate pattern injuries on her body. He converted the photos to digital images to compare certain wounds with physical evidence linked to the homicide, *i.e.*, metal door chains found in appellant's toolbox and the walkie-talkie. Dr. Oliver opined that there was "a correspondence in shape and scale" between the door chains and marks on the victim's body and that he could not rule out "a correspondence" with markings on the victim and the walkie-talkie.

{¶ 62} Because neither expert offered an opinion with any reasonable degree of scientific certainty, appellant claims that the testimony should not have been admitted as expert testimony.

**{¶ 63}** Both Stokes and Dr. Oliver were presented as experts in their fields. The standard for determining the admissibility of expert testimony is set forth in Evid.R. 702: whether expert testimony is admissible depends on whether it will assist the trier of fact to understand matters "beyond the knowledge or experience possessed by lay persons." See, generally, *State v. Buell* (1986), 22 Ohio St.3d 124, 129, 22 OBR 203, 207, 489 N.E.2d 795, 801. The state claims that in any event, the opinions were nevertheless admissible, at least as lay witness testimony under Evid.R. 701. See *Jells*, 53 Ohio St.3d at 28-29, 559 N.E.2d at 470-472. In addition, the state cites *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 191, 616 N.E.2d 909, 915, where we held that experts could testify as to possibility rather than only probability, and that such testimony becomes an issue of sufficiency and not admissibility.

**{¶ 64}** Agent Stokes's testimony was admissible under Evid.R. 702(C). The comparisons he made between the walkie-talkie and wounds on Nathan's body were similar to techniques used to compare shoeprints and fingerprints in other cases. The reliability of the comparison in this case was in fact called into question by defense counsel during cross-examination. The reliability of Dr. Oliver's conclusions was also effectively challenged on cross-examination when he conceded that he could not say for certain that a walkie-talkie or hotel door chains made the wound markings on Nathan's body.

**{¶ 65}** Since counsel was permitted to fully cross-examine the expert witnesses, and since the trial court properly instructed the jury that they were to decide what weight to give such testimony, no abuse of discretion by the trial court occurred. *Buell,* 22 Ohio St.3d at 132-133, 22 OBR at 203, 489 N.E.2d at 803-804. Accordingly, we overrule appellant's thirteenth proposition.

*Sufficiency of the Evidence*

**{¶ 66}** In his twenty-first proposition of law, appellant argues that the trial court should have granted his motions for acquittal, pursuant to Crim.R. 29(A), because the evidence presented was insufficient to support his convictions.

**{¶ 67}** When reviewing a claim of insufficient evidence, the relevant inquiry is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. The verdict will not be disturbed unless the reviewing court finds that reasonable minds could not reach the conclusion reached by the trier of fact. *Id.* at 273, 574 N.E.2d at 503.

**{¶ 68}** In its brief before this court, the state sets forth nine facts that collectively provide substantial evidence of appellant's guilt. Four of the nine facts cited by the state derive from Dr. McDonough's testimony and medical records, which revealed that appellant's hand wound was infected by the *eikenella corrodens* organism that is usually found in dental plaque. At the crime scene, a tooth of Nathan's was discovered lying under her head. Another tooth was recovered from her stomach during the autopsy.

**{¶ 69}** Looking at the remaining facts set forth by the state, appellant was working at the hotel at the time of the murder. Appellant also had possession of a master key that could open the hotel room where Nathan was murdered.

**{¶ 70}** In addition, appellant's statement as to his whereabouts at the time of the murder could not be substantiated. Moreover, the wound markings on the victim were consistent with objects issued to appellant by the hotel. Testimony at trial noted a similarity between wound markings on Nathan's body and the shape of objects (walkie-talkie and hotel door chains) that appellant possessed or had access to.

**{¶ 71}** Most damaging was the fact that the victim's unique pendant was found in the trunk of appellant's car. This crucial piece of evidence plainly linked appellant to the murder. Given all of the foregoing, sufficient evidence exists to support appellant's conviction under the test set forth in *Jenks*. Therefore, we overrule appellant's twenty-first proposition.

### *Jury Instructions*

**{¶ 72}** In his twenty-third proposition of law, appellant asserts that the court's instruction on reasonable doubt based on the definition in R.C. 2901.05(D) constitutes reversible error. However, beginning with *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus, we have uniformly upheld use of the statutory definition of reasonable doubt in capital case jury instructions. See, *e.g.*, *State v. Moore* (1998), 81 Ohio St.3d 22, 37, 689 N.E.2d 1, 15. We overrule appellant's twenty-third proposition.

### SENTENCING ISSUES

### *Jury Instructions*

**{¶ 73}** In his fourteenth proposition of law, appellant asserts error in the trial court's failure to instruct on residual doubt, which led the state to argue that appellant had forfeited any right to a weighing of aggravating circumstances against mitigating factors, since no mitigating evidence was presented. Appellant further contends that the trial court erred in repeatedly instructing the jury that their verdict was a "recommendation."

**{¶ 74}** Both of these arguments lack merit. Residual doubt is not an acceptable mitigating factor. *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus. In addition, use of the term "recommendation" does not diminish the jury's sense of responsibility, accurately reflects Ohio law, and does not constitute error. *State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75, 80-81. We overrule appellant's fourteenth proposition.

{¶ 75} In his twenty-fourth proposition of law, appellant argues that the court erred in using the statutory definition of reasonable doubt during penalty-phase instructions. Admittedly, the trial court's reference to the "truth of the charge" is not the preferred language for a penalty-phase reasonable-doubt instruction. *Moore,* 81 Ohio St.3d at 37, 689 N.E.2d at 15. However, any such error is harmless where the trial court clearly instructs the jury that, before recommending death, it must be convinced beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, and that the prosecution has the burden of proof on the issue. *State v. Taylor* (1997), 78 Ohio St.3d 15, 29-30, 676 N.E.2d 82, 96. Since the trial court clearly instructed the jury in this manner, appellant's twenty-fourth proposition is not well taken.

*Proportionality Review*

{¶ 76} In his sixteenth proposition of law, appellant claims that his sentence is disproportionately severe in relation to the crime committed, and to sentences imposed in similar cases, and thus violates the Eighth Amendment to the United States Constitution. In his seventeenth proposition of law, appellant asserts that his sentence is disproportionately severe when compared to other death penalty cases in Ohio and Hamilton County. In his twenty-fifth proposition of law, appellant contends that proportionality review as currently employed does not comport with either federal or state constitutional law, nor does it follow the plain language of R.C. 2929.05.

{¶ 77} None of appellant's propositions warrants a reversal. We have consistently rejected these same arguments because (1) there is no federal constitutional requirement for proportionality review in capital cases, see, *e.g.*, *Moore,* 81 Ohio St.3d at 41-42, 689 N.E.2d at 18; and (2) the statutorily required proportionality review entails comparing only those cases where death is imposed. *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. Proportionality review of appellant's sentence will be

accomplished as part of our independent sentence review. We overrule appellant's sixteenth, seventeenth, and twenty-fifth propositions.

*Failure to Merge Murder Counts*

**{¶ 78}** In his eighteenth proposition of law, appellant contends that the submission to the jury of two counts of aggravated murder, where only one conviction could lawfully be entered, tainted the jury's consideration of its sentencing recommendation. Appellant submits that his death sentence must be set aside, since it cannot be determined whether the inclusion of a second count of aggravated murder affected the jury's decision to recommend the death penalty.

**{¶ 79}** Clearly, since both counts of aggravated murder involved the same victim, the trial court should have merged these counts, *State v. Huertas* (1990), 51 Ohio St.3d 22, 28, 553 N.E.2d 1058, 1066, instead of merely imposing "concurrent" death sentences. We confronted this same argument in *Moore,* 81 Ohio St.3d at 39, 689 N.E.2d at 17, where we held that although imposing death sentences on both counts constitutes error, the error is procedural and harmless beyond a reasonable doubt. See *State v. Brown* (1988), 38 Ohio St.3d 305, 317-318, 528 N.E.2d 523, 538-539. Moreover, merger of the death sentences as part of our independent assessment can readily cure any error that taints the jury's sentencing verdict. See *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70, 82. Accordingly, we reject appellant's eighteenth proposition.

*Consecutive Sentencing*

**{¶ 80}** In his twenty-second proposition of law, appellant claims that a trial court cannot legally impose a term of imprisonment to be served consecutively to a death sentence. However, the issue is rendered moot either by the execution of the death sentence or by the failure to execute the death sentence. See, *e.g.*, *State v. Davie* (1997), 80 Ohio St.3d 311, 328, 686 N.E.2d 245, 262; *Moore,* 81 Ohio St.3d at 38, 689 N.E.2d at 16. Appellant's twenty-second proposition is overruled.

*Cumulative Error*

**{¶ 81}** Under his twenty-sixth proposition of law, appellant contends that individual and collective errors, whether raised by counsel or not, necessitate reversal of his conviction and death sentence. Nevertheless, appellant received a fair trial, and any error is found to be nonprejudicial. "Such errors cannot become prejudicial by sheer weight of numbers." *State v. Hill* (1996), 75 Ohio St.3d 195, 212, 661 N.E.2d 1068, 1084. Accordingly, we overrule appellant's twenty-sixth proposition.

PROSECUTORIAL MISCONDUCT

**{¶ 82}** In his fifth, sixth, seventh, and eighth propositions of law, appellant asserts a number of instances of prosecutorial misconduct throughout trial. Appellant argues that when the alleged misconduct is considered individually and collectively, the result must be a reversal of his convictions and death sentence. Appellant's fifth proposition of law is essentially a summary introductory argument of the other three propositions submitted by appellant.

**{¶ 83}** The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87.

**{¶ 84}** In the first group of comments cited by appellant under his sixth proposition, he claims that the prosecutor improperly appealed to the jurors' passions when he criticized defense counsel for attempting to shift culpability for the murder to other hotel employees: "It's very unfortunate. Their names have been dragged through the mud in front of the cameras, in front of the press, as being accused of murder. A murder that Elwood Jones did." Defense counsel objected, but the court simply instructed the jury: "[Y]ou heard the evidence as well as I did. I'll let you decide what was said about McCall and Henry." The prosecutor's

comment appears to be a fair rebuttal to the defense strategy of shifting suspicion of the murder to others who worked at the hotel, and can hardly be characterized as an improper appeal to the jurors' passions.

{¶ 85} Appellant also complains that the prosecutor misstated the evidence in asserting that only the banquet department had the kind of walkie-talkie used for comparison to the victim's wounds. Defense counsel's objection was not ruled upon, but one prosecution witness did in fact testify that State Exhibit 6, a walkie-talkie of that kind, was one used by the banquet department, in which appellant worked. Although one defense witness asserted that different departments at the hotel had walkie-talkies of that kind, the prosecutor's statement was harmless.

{¶ 86} Appellant next cites comments where the prosecutor argued that the defense "conceded that a radio made that mark" on the victim's body, and where the prosecutor asserted and further intimated that appellant's girlfriend, Earlene Metcalfe, lied for him. Both comments were objected to, and the trial court sustained both objections. However, the prosecutor continued to claim that Metcalfe lied, even though she never testified at trial. In addition, the prosecutor argued that shoes found during the search of her residence belonged to appellant, even though no evidence at trial supported that assertion. We agree with the court of appeals that the comments concerning Metcalfe and the shoes were improper because they alluded to facts not in evidence. However, these isolated comments were not outcome-determinative and did not deprive appellant of a fair trial.

{¶ 87} Appellant next argues under his seventh proposition of law that the prosecutor denigrated the role and trial tactics of defense counsel, and suggested that defense counsel were attempting to hide the truth. Here, appellant is referring to the prosecutor's remarks on defense counsel's attempt to cast suspicion for the murder on other hotel employees. During trial, defense counsel elicited testimony from hotel employee Lisa Dietz that another hotel employee, Bill McCall, who left the hotel on the day of the murder, had access to master keys and radios at the hotel.

After the defense rested, the state called Bill McCall as a rebuttal witness, and he refuted the implication that he had been involved in the murder. During closing argument, the prosecutor commented on defense counsel's "search for doubt, not a search for the truth." This remark, not objected to, was not outcome-determinative and did not deprive appellant of a fair trial.

{¶ 88} In addition, appellant points to comments made during the prosecutor's closing argument concerning defense expert Dr. Solomkin's testimony regarding the nature of appellant's hand injury. Defense counsel's objection to the comments was overruled. Appellant argues that the prosecutor's comments improperly implied that the defense expert would say whatever defense counsel wanted him to say. However, these comments were made during argument. Given the substantial evidence submitted in this case, we find that these isolated comments made during argument were nonprejudicial.

{¶ 89} Appellant also claims that the prosecutor misrepresented defense counsel's closing argument during the mitigation phase, and that the defense had "forfeited at this stage of the trial. * * * They are asking you to fill in these blanks that are their mitigation. There is none. They have presented none and now they want you to basically fill in some things for them, to create evidence as it were." However, these comments constituted fair comment by the prosecutor and were neither improper nor prejudicial. Appellant chose not to present any mitigation except for residual doubt.

{¶ 90} Under his eighth proposition of law, appellant asserts prosecutorial misconduct in the prosecutor's use of the nature and circumstances of the offense as an aggravating circumstance. During the rebuttal closing argument at the mitigation phase, the prosecutor said:

"What is worth more to him at that point, the life of this lady who has absolutely done nothing to him or a trinket? He could have left her alive. What's his choice? Right here. (Indicating)

27

"And thankfully it was that greed that tripped him up in this case. Had he left [*sic*] that go, maybe he would have never been caught but he decided at that point and that's the weighing process that he went through. That's the value he put on that lady's life.

"I trust when you weigh that aggravating circumstance you will give Miss Nathan's life more worth than he did."

{¶ 91} Defense counsel's objection that the prosecutor was arguing the nature and circumstances of the offense as an aggravating circumstance was overruled. The court of appeals found this statement to be improper and erroneous, but found the comment to be nonprejudicial. This type of prosecutorial argument was directly proscribed in *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph two of the syllabus:

"It is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.' "

{¶ 92} Unlike *Wogenstahl*, the defense attorney did object immediately after the comment was made. The comment violated the law enunciated in *Wogenstahl.* But in view of the entire penalty-phase proceedings, we find the error was harmless. See *State v. Williams* (1983), 6 Ohio St.3d 281, 6 OBR 345, 452 N.E.2d 1323.

{¶ 93} In the foregoing consideration, we have found several instances of error that were not outcome-determinative. A similar situation arose in *State v. Lott* (1990), 51 Ohio St.3d 160, 555 N.E.2d 293. In *Lott*, 51 Ohio St.3d at 166, 555 N.E.2d at 301, this court, quoting *United States v. Hasting* (1983), 461 U.S. 499, 508-509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96, 106, observed that " 'given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-

free, perfect trial, and that the Constitution does not guarantee such a trial. * * * [Citations omitted.] * * *

{¶ 94} " ' * * * [I]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless including most constitutional violations.' " In sum, we overrule appellant's fifth, sixth, seventh, and eighth propositions.

## CONSTITUTIONALITY

{¶ 95} In his fifteenth proposition of law, appellant challenges Ohio's death penalty scheme on numerous constitutional grounds. However, we have previously found these arguments to lack merit. See, *e.g., State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585; *Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Watson* (1991), 61 Ohio St.3d 1, 572 N.E.2d 97; *State v. Coleman* (1988), 37 Ohio St.3d 286, 525 N.E.2d 792; and *Buell,* 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795. Therefore, these claims may be summarily rejected. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. We summarily overrule appellant's fifteenth proposition.

## INDEPENDENT REVIEW AND PROPORTIONALITY

{¶ 96} Appellant was charged with and convicted of being the principal offender in the aggravated murder of Rhoda Nathan during the course of an aggravated burglary and aggravated robbery. R.C. 2929.04(A)(7). These counts are now merged for sentencing purposes. See *Moore,* 81 Ohio St.3d at 39, 689 N.E.2d at 17.

{¶ 97} Nothing in the nature and circumstances appears mitigating. On the morning of September 3, 1994, appellant was working at the Embassy Suites Hotel in Blue Ash, when he used his master key to open the hotel room where Rhoda Nathan was staying. Upon encountering Nathan, appellant beat her to death with his hands, a walkie-talkie radio, and other items. Before leaving the scene of the

crime, he stole money out of Elaine Schub's purse and stole the diamond pendant necklace that Nathan always wore around her neck.

{¶ 98} Since appellant chose not to present any mitigating evidence, there is little evidence for us to review. Nothing about appellant's history, character, or background, as reflected in the record, suggests mitigating factors other than that he was employed, and was married. Appellant maintained his innocence throughout his trial, and claimed to have twice turned down offers to plead guilty to a lesser offense. The only mitigating factor appellant has presented is residual doubt, which is not an acceptable mitigating factor under R.C. 2929.04(B). See *McGuire,* 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus. Accordingly, we hold that the merged aggravating circumstances outweigh any mitigating factors beyond a reasonable doubt.

{¶ 99} We find the death penalty in this case to be both appropriate and proportionate when compared with similar capital cases combining murder with aggravated burglary, see, *e.g.*, *Wogenstahl,* 75 Ohio St.3d 344, 662 N.E.2d 311; *State v. Campbell* (1994), 69 Ohio St.3d 38, 630 N.E.2d 339; and murder with aggravated robbery, see, *e.g.*, *State v. Green* (1993), 66 Ohio St.3d 141, 609 N.E.2d 1253; *Davie,* 80 Ohio St.3d 311, 686 N.E.2d 245.

{¶ 100} Based on all the foregoing, we affirm appellant's convictions and sentences, including the death sentence.

*Judgment affirmed.*

DOUGLAS, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., PFEIFER and COOK, JJ., concur separately.

————————

**COOK, J., concurring.**

{¶ 101} I concur in the majority's affirmance of the conviction and death sentence. I disagree, however, with the resolution of Jones's first proposition of law, in which Jones argues that his trial lawyers performed ineffectively in failing

to object to Dr. McDonough's testimony on grounds of physician-patient privilege. See R.C. 2317.02(B). The majority finds no ineffective assistance because the trial court "would have been required to overrule" any objection to Dr. McDonough's testimony. This conclusion stems from the belief that Dr. McDonough *could have* disclosed Jones's injury to the authorities under R.C. 2921.22(B), thereby resulting in the loss of any evidentiary privilege. I cannot join in the majority's analysis because I view it as misapplying the reporting and privilege statutes.

{¶ 102} R.C. 2317.02(B)(1) states that a physician shall not testify "concerning a communication made to the physician * * * by a patient in that relation or the physician's * * * advice to a patient." In turn, "communication" is broadly defined to include "acquiring, recording, or transmitting any information, in any manner, concerning any facts, opinions, or statements necessary to enable a physician * * * to diagnose, treat, prescribe, or act for a patient." R.C. 2317.02(B)(4)(a). Thus, the privilege covers a patient's mere exhibition of an injury to his physician as well as any oral or written communications between patient and physician. *Baker v. Indus. Comm.* (1939), 135 Ohio St. 491, 14 O.O. 392, 21 N.E.2d 593, paragraph one of the syllabus. A physician-patient "communication" also includes records, charts, laboratory results, and the physician's diagnosis. R.C. 2317.02(B)(4)(a); see, also, *State v. Webb* (1994), 70 Ohio St.3d 325, 334, 638 N.E.2d 1023, 1032. This broad definition of the "communication" covered by the physician-patient privilege encompasses much of the evidence and testimony elicited from Dr. McDonough. The testimony and evidence about Jones suffering a hand injury, the diagnosis of it, the surgery performed, and the laboratory results concerning the *eikenella corrodens* organism were all protected by the privilege.

{¶ 103} The majority decides that R.C. 2921.22(B) provides a statutory exception to the physician-patient privilege and that the evidence and testimony obtained from Dr. McDonough were therefore admissible. R.C. 2921.22(B)

imposes a duty upon physicians "to report to law enforcement authorities any gunshot or stab wound treated or observed by the physician * * * or any serious physical harm to persons that the physician * * * knows or has reasonable cause to believe resulted from an offense of violence." Because Dr. McDonough suspected that fist-to-mouth contact caused Jones's hand injury, the majority determines that R.C. 2921.22(B) applies even though Dr. McDonough did not actually report the injury to law enforcement authorities.[1]

{¶ 104} In support of its conclusion, the majority relies on *State v. Antill* (1964), 176 Ohio St. 61, 26 O.O.2d 366, 197 N.E.2d 548, which interpreted the predecessor statute to R.C. 2921.22(B) as permitting physician testimony without violating the physician-patient privilege. In *Antill*, this court explained that the purpose of the physician-patient privilege is to encourage patients to disclose fully all their symptoms to their physicians "without fear that such matters will later become public." *Antill*, *supra*, 176 Ohio St. at 64-65, 26 O.O.2d at 368, 197 N.E.2d at 551. The court noted, however, that this purpose has already been undermined when a physician performs the statutory duty to disclose treatment of a person injured by a deadly weapon. *Id.* at 65, 26 O.O.2d at 368, 197 N.E.2d at 552. Because the main purpose of the privilege had already been compromised, "[t]he only purpose that sustaining the privilege can now serve is to obstruct the course of justice." *Id.* The court thus found no reason to recognize the privilege as a basis for excluding a physician's testimony at trial.

---

1. The threshold requirement for triggering R.C. 2921.22(B)'s reporting duty is the physician's observation of any gunshot wound, stab wound, or serious physical harm that the physician knows or believes to have resulted from an offense of violence. As Jones had no gunshot or stab wounds, the only remaining predicate for claiming a duty to report on the part of Dr. McDonough is serious physical harm. Dr. McDonough arguably treated Jones for "serious physical harm" within the statutory definition of that term; Jones was hospitalized and underwent surgery for his hand injury. See R.C. 2901.01(A)(5)(a) and (c).

**{¶ 105}** The majority applies the *Antill* reasoning to this case despite the fact that Dr. McDonough *did not* report Jones's injury to police under R.C. 2921.22(B). But *Antill*'s reasoning suggests only that the physician-patient privilege is lost when there has been an *actual* report pursuant to the physician's statutory duty. Indeed, the *Antill* court emphasized that "[t]he publicity against which the privilege is supposed to protect *has already taken place*" because the details of the wound "*must have been reported* by the physician to a law-enforcement officer." (Emphasis added.) *Antill*, 176 Ohio St. at 65, 26 O.O.2d at 368, 197 N.E.2d at 552. In this case, however, because Dr. McDonough did not report Jones's injury, no "publicity" of it had yet taken place. The majority's reasoning therefore extends the *Antill* rationale to a situation where the purpose of the privilege *could have been*, but was not actually, compromised by disclosure.

**{¶ 106}** Even assuming that the majority's extension of *Antill* is a logical one, *Antill* is itself flawed and deserves reconsideration. The *Antill* court basically concluded that the duty to disclose under R.C. 2921.22's predecessor created an exception to the physician-patient privilege in R.C. 2317.02. This view is unsupported by either the disclosure statute or the privilege statute. R.C. 2317.02(B) provides a *testimonial* privilege that allows a patient to prevent his or her doctor from *testifying* on certain matters arising out of the physician-patient relationship. It is subject to numerous built-in exceptions, none of which is applicable here. See R.C. 2317.02(B)(1)(a) to (c). In contrast, R.C. 2921.22(B) commands a doctor to report patient information to law enforcement that would otherwise be confidential. The disclosure statute does not, however, command the doctor to *testify* about those matters in court. The extension of R.C. 2921.22(B)'s reporting duty into an exception to the R.C. 2317.02(B) privilege mistakenly blurs

the distinction between the duty of *confidentiality*, which the duty of disclosure supersedes, and an evidentiary *privilege*, which is unaffected by disclosure.[2]

{¶ 107} What the *Antill* court created, and what the majority endorses today, is an additional exception to the testimonial privilege (based on the public interest in detecting crime) that the General Assembly has not specifically provided by statute. But the General Assembly does not need judicial assistance in this regard. Significantly, it has recognized exceptions to the physician-patient privilege in situations involving a duty to disclose. For example, R.C. 2921.22(E)(5) expressly states that "the physician-patient relationship is not a ground for excluding evidence regarding a person's burn injury or the cause of the burn injury in any judicial proceeding" arising from the duty to report burn injuries under R.C. 2921.22(E). Similarly, R.C. 2921.22(F)(2) also states that "information regarding the report" of domestic violence under R.C. 2921.22(F)(1) is admissible and shall not be excluded by the physician-patient privilege. Thus, the legislature apparently recognizes that a duty to disclose does not necessarily destroy the physician-patient testimonial privilege. Other states have likewise recognized the distinction between a reporting duty and an evidentiary privilege, enacting statutes or evidentiary rules that exempt information and testimony (such as that given by Dr. McDonough in this case) from the physician-patient privilege. See, *e.g.*, Kan.Stat.Ann. 60-427(e) (no privilege for

---

2. The majority cites the Legislative Service Commission's Commentary to Am.Sub.H.B. No. 511 (which enacted R.C. 2921.22[B]) to support its conclusion that the disclosure statute codifies an exception to the physician-patient testimonial privilege. The majority emphasizes the commission's comment that "[t]he reporting requirement under this part of the section is absolute, i.e., no privilege attaches in the cases covered."

While at first glance the phrase "no privilege attaches" seems compelling, it becomes increasingly less so when examined in context. Indeed, the phrase comes at the end of a sentence describing the nature of the reporting requirement. The commission's comment makes clear that no privilege applies when a doctor is required to *report to law enforcement* under R.C. 2921.22(B). In other words, there is no "privilege" to prevent a doctor from making the *report* required by R.C. 2921.22(B). Whether the *testimonial* privilege of R.C. 2317.02(B) remains, however, is an entirely different matter. The majority's view to the contrary inappropriately elevates the commission's comment from an explanation of R.C. 2921.22(B) to a codified exception to R.C. 2317.02(B). And no such exception appears in the statutory language.

information required to be reported by physician or patient); Vt.R.Evid. 503(d)(6) (no privilege extends to medical conditions required to be reported by statute); Alaska R.Evid. 504(d)(5) (no privilege applies to information that physician, psychotherapist, or patient is required to report) and 504(d)(7) (no physician-patient privilege applies in a criminal proceeding); West's Ann.Cal.Evid.Code 994 and 998 (no physician-patient privilege in a criminal proceeding). While I do not necessarily disagree with the *Antill* court's balancing of the physician-patient privilege with the public interest in criminal justice, the Constitution commits that balancing to the General Assembly and not to this court. See *State v. Smorgala* (1990), 50 Ohio St.3d 222, 223-224, 553 N.E.2d 672, 674-675. Accordingly, I would hold that R.C. 2921.22(B) is not a statutory exception to the physician-patient privilege in R.C. 2317.02(B).

{¶ 108} I therefore disagree with the majority that the trial court would have been required to overrule an objection to Dr. McDonough's testimony based on physician-patient privilege. I also believe that Jones's trial counsel performed deficiently in failing to raise this objection. By failing to object, Jones's trial counsel in effect waived the privilege and allowed Dr. McDonough to offer a link in the state's circumstantial case. Dr. McDonough's testimony about the presence of the *eikenella corrodens* organism in Jones's hand wound corroborated the prosecution's theory of a fist-to-mouth injury. This testimony and the medical evidence along with it tied Jones to the fatal blows inflicted upon Nathan.

{¶ 109} Nevertheless, I do not believe that, but for the deficient performance by trial counsel in failing to raise the physician-patient privilege, there is a reasonable probability that Jones would have been acquitted. Even if Jones's trial counsel had raised the objection, they would not have been successful in completely barring Dr. McDonough from testifying. Dr. McDonough's testimony that he treated Jones was not privileged. See *Jenkins v. Metro. Life Ins. Co.* (1961), 171 Ohio St. 557, 562, 15 O.O.2d 14, 17, 173 N.E.2d 122, 125 (physician-patient

privilege does not bar testimony regarding the fact of professional consultation by a person on a certain date). This fact of consultation, coupled with the police's discovery from hotel employees that Jones had injured his hand on the morning of Nathan's murder, provided circumstantial evidence of Jones's identity as the killer. Further, there was evidence that Nathan's wounds were inflicted by objects consistent with door chains found in Jones's car and a walkie-talkie that Jones used while working at the hotel. Another key component of the state's case was that Nathan's missing pendant was discovered in Jones's car. Given all of the evidence against Jones, I cannot conclude that exclusion of Dr. McDonough's testimony about Jones's injury would have led to a different trial outcome. I would therefore reject the appellant's first proposition of law on that basis.

{¶ 110} While expressing these reservations, I concur in the judgment of the majority.

MOYER, C.J., and PFEIFER, J., concur in the foregoing concurring opinion.

————————————