DECISION.
{¶ 1} Defendant-appellant Charles Blevins appeals his conviction for murder, for which he was sentenced to 15 years to life in prison. Blevins argues that the evidence presented at his trial was insufficient to convict him and that his conviction was against the manifest weight of the evidence. We affirm.
{¶ 2} The victim in this case was 19-year-old Robert White. At Blevins's trial, the state offered the following testimony and evidence.
{¶ 3} Curtis Buckley, a friend of White's, testified that White sold drugs out of his apartment on Hale Avenue in Avondale. On the evening that he died, White made several drug sales in his apartment to various customers. Buckley, who was in the apartment with White for most of the evening, testified that White had a large amount of cash in the apartment, which White kept in two wads of bills. Buckley testified that Blevins visited White two times that night. The first time, Blevins attempted to trade heroin for crack cocaine, but White refused. About 45 minutes later, Blevins returned with a woman. Blevins and White went into a back room to talk for about five minutes, and then Blevins and the woman left. Buckley left soon after.
{¶ 4} Gwendolyn Barden, a neighbor of White's who frequently bought drugs from him, testified that she visited White's apartment several times that evening. The first time, she passed Blevins in the hallway of White's building. Blevins turned around and accompanied Barden towards White's apartment, but did not go in with her. The second time, Blevins was again standing in the hallway, near White's door. White allowed Barden in, but asked Blevins to wait outside. The third time Barden went to White to buy crack cocaine, she went with two other women. As the women were leaving White's apartment, there was a knock at the door, and White opened the door to find Blevins. Barden testified that about a half hour after she left White the third time, she was stopped by someone on the street who told her that White "`must have had a fight with his woman.' He said, `Blood everywhere. He cut all up.'"
{¶ 5} Two other neighbors of White testified about that night. Conrad Hassell, whose apartment was directly below White's, was awakened, between 4:00 and 5:00 AM, by noise in the apartment above. Hassell testified that he heard a lot of rambling around, with somebody going from one end of the room to another, and then "a crash like something hit ground real hard." Hassell called the police and went back to sleep.
{¶ 6} White's neighbor across the hallway, Brian Jordan, testified that he also was awakened around 4:30 AM by loud noises. Jordan testified that he heard two voices arguing, White's and another person's. The other person said, "I want my money," and then there were loud sounds of something being thrown and hitting the floor. Jordan then heard the other person say, "You got yours like I got mine." Jordan waited 15 or 20 minutes and then looked out his apartment door into the hallway. He saw a trail of blood from White's apartment along the hallway floor. Jordan did not call the police, but went back to sleep.
{¶ 7} Lucinda Holly testified that, at about 5:00 AM, Blevins, a friend of her brother's, knocked on the door of her house. Holly's brother, Edward, and his girlfriend, Latisha Bell, answered the door, and Blevins told them that some men had robbed him and shot him. They offered to take him to a hospital, but Blevins wanted a ride to Westwood. Bell said she would take Blevins. During the ride, Bell noticed that Blevins was no longer clutching his stomach where he was allegedly "shot," but was instead counting money, mostly $20 bills, in a wad. She also noticed the money was bloody. While counting the money, Blevins said, "My nigger is fucked up worse than me." Blevins decided he wanted to go to Winton Place instead of Westwood, and when he got out of the car, he paid Bell $20, said, "You don't know me and I don't know you, if anybody asks you," and then ran away. Blevins was arrested in Columbus about one month later.
{¶ 8} At about 6:30 AM, Cincinnati Police Officer Gary Christie responded to a call reporting a disturbance in White's apartment and discovered White's body in a pool of blood, with numerous stab wounds. Cincinnati Police Criminalist Ron Camden testified that the crime scene in White's apartment was "one of the top two or three of the worse looking crime scene reference to the amount of carnage" that he had seen in 19 years of working on homicide crime scenes.
{¶ 9} Camden testified that the scene was "totally filled with blood and destruction" for the entire 30-foot length of the apartment. There was a significant amount of blood in the kitchen, the living room, and the bedroom every room except the bathroom. There was blood on the walls, spattered on windows and sills, and pooled on the floor, the furniture, and the bedding. Blood was in the hallway outside White's apartment, on his apartment door, down the stairwell, and out the door onto the sidewalk. Camden testified that, in his opinion and experience, the evidence at the scene indicated that a fierce struggle had taken place between two individuals White and his killer.
{¶ 10} Police collected evidence, including a bloody knife bent nearly in half, seven pieces of crack cocaine, and photographs of bloody shoe prints. In addition, police took samples from the many spots of blood in the apartment, the hallway, and outside on the sidewalk.
{¶ 11} Hamilton County Coroner's Office Criminalist Joan Burke testified that DNA testing done on the knife found in White's apartment revealed a mix of blood from more than one individual. The major DNA profile on the knife, meaning the largest quantity of blood, was consistent with the DNA profile of White. The minor DNA profile on the knife was consistent with the DNA profile of Blevins. In addition, Burke testified that all the blood swabs that were analyzed from White's kitchen, from the steps outside the door, and from the sidewalk outside the apartment building were consistent with Blevins's DNA profile.
{¶ 12} Dr. Utz, the deputy coroner who performed the autopsy on White, testified that White's internal and external jugular veins were cut, but that the actual cause of death was a stab wound in the chest that penetrated the pericardial sack around the heart. Utz testified that there were other stabbing injuries and defensive cuts. Utz also testified that the wounds on White were consistent with wounds caused by the knife found in White's apartment.
{¶ 13} Blevins now raises two assignments of error that the state presented insufficient evidence to convict him, and that his conviction was against the manifest weight of the evidence. The legal concepts of sufficiency of the evidence and weight of the evidence are distinct.[1]
A challenge to the sufficiency of the evidence attacks the adequacy of the evidence presented. Whether the evidence is legally sufficient to sustain a verdict is a question of law.[2] The relevant inquiry in a claim of insufficiency is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt.[3]
{¶ 14} A challenge to the weight of the evidence attacks the credibility of the evidence presented.[4] When evaluating the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[5] The discretionary power to reverse should be invoked only in exceptional cases "where the evidence weighs heavily against the conviction."[6]
{¶ 15} The state's evidence showed that White and Blevins interacted several times on the night of White's murder. Blevins attempted to buy drugs from White, but was refused on at least one occasion. Several witnesses heard a loud struggle in White's apartment, with a voice saying, "I want my money." Soon after, Blevins, claiming to have been robbed and shot, showed up at a friend's house needing a ride. During the ride, he was seen counting a large stack of cash with blood on it. He volunteered, "My nigger is fucked up worse than me." Police and criminalists testified that Blevins's blood was the minor DNA profile on a knife that was consistent with the fatal stab wounds on White. Blevins's blood was in the kitchen of White's apartment, outside the door in the hallway, and out on the sidewalk.
{¶ 16} After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we conclude that there was substantial and credible evidence to prove all essential elements of the crime and to support the jury's verdict. The evidence was legally sufficient to sustain Blevins's conviction, and Blevins's conviction was not against the manifest weight of the evidence. Accordingly, Blevins's first and second assignments of error are overruled, and the trial court's judgment is affirmed.
Judgment affirmed.
Gorman and Sundermann, JJ., concur.
[1] See State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
[2] Id.
[3] See State v. Jones, 90 Ohio St.3d 403, 417, 2000-Ohio-187,739 N.E.2d 300; State v. Jenks (1991), 61 Ohio St.3d 259, 273,574 N.E.2d 492.
[4] See State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[5] See id.; State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[6] See State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.