[Cite as *Rowland v. Buehrer*, 2017-Ohio-7096.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| DIANE F. ROWLAND | : | |
| | : | |
| Plaintiff-Appellant | : | C.A. CASE NO. 27412 |
| | : | |
| v. | : | T.C. NO. 15-CV-5441 |
| | : | |
| STEVEN P. BUEHRER, | : | (Civil Appeal from |
| ADMINISTRATOR, et al. | : | Common Pleas Court) |
| | : | |
| Defendants-Appellees | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the __4th_ day of __August____, 2017.

. . . . . . . . . . .

GARY D. PLUNKETT, Atty. Reg. No. 0046805 and RACHEL D. SIEKMAN, Atty. Reg. No. 0091012, 3033 Kettering Blvd., Suite 201, Dayton, Ohio 45439
    Attorneys for Plaintiff-Appellant

DAVID C. KORTE, Atty. Reg. No. 0019382 and MICHELLE D. BACH, Atty. Reg. No. 0065313 and JOSHUA R. LOUNSBURY, Atty. Reg. No. 0078175, 33 W. First Street, Suite 200, Dayton, Ohio 45402
    Attorneys for Defendant-Appellee, Dayton Public Schools

CHERYL NESTER, Atty. Reg. No. 0013264, 150 E. Gay Street, 22nd Floor, Columbus, Ohio 43215
    Attorney for Defendant-Appellee, Bureau of Workers' Compensation

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1}  This matter is before the Court on the January 17, 2017 Notice of Appeal of

Diane Rowland. Rowland appeals from the January 13, 2017 decision of the trial court that reconsidered and affirmed its decision on Dayton Public Schools' ("DPS") motion in limine to exclude from trial the testimony of Rowland's expert witness, Dr. Jonathon Paley, and granted summary judgment in favor of DPS. For the reasons that follow, the trial court's decision is reversed, and the matter is remanded for proceedings consistent with this opinion.

{¶ 2} On November 10, 2015, Rowland filed a Complaint against DPS and Stephen P. Buehrer, Administrator, Bureau of Workers' Compensation. The Complaint provides that Rowland, a DPS employee, was injured in the course of her employment on January 14, 2015, and that she filed a claim for workers' compensation benefits, to which Claim No. 15-801203 was assigned. According to the Complaint, the claim was allowed for "concussion without coma; sprain of neck; sprain lumbar region; contusion forehead; contusion right shoulder; contusion left shoulder; contusion left hip; contusion left knee." The Complaint provides that Rowland filed a motion to amend her claim to include "left shoulder supraspinatus tendon tear," and that the District Hearing Officer denied the motion to amend the claim on June 19, 2015. The Complaint provides that Rowland appealed the District Hearing Officer's decision to the Staff Hearing Officer who, on July 28, 2015, granted Rowland's motion for the additional condition. DPS appealed the Staff Hearing Officer's decision to the Industrial Commission, and on August 19, 2015, the Industrial Commission refused the appeal, according to the Complaint. The Complaint provides that DPS filed a Notice of Appeal in the court of common pleas.

{¶ 3} On August 31, 2016, DPS filed the motion in limine asking the trial court to exclude the deposition testimony of Dr. Paley. The motion provides that Rowland, a

school bus driver, was injured on January 24, 2011, when she slipped on the ice, and that she filed a claim that was assigned No. 11-303368 and allowed for "contusion left wrist; contusion left hip; contusion left hand; cervical sprain; sprain left shoulder and sprain lumbar." The motion provides that Rowland initially obtained treatment at Concentra but then sought treatment from Paley. The motion provides that "Dr. Paley stated on 5/12/14 and 11/19/14 that he suspected Rowland had a left rotator cuff tear. * * * He recommended, but did not obtain, an MRI of the left shoulder to confirm the presence of the tear, or its size." The motion provides that DPS does not contest the allowed conditions in Claim No. 15-801203, and that "the sole issue for the jury to decide in this case is whether the 2015 claim should be additionally allowed for the left shoulder tear."

**{¶ 4}** DPS asserted that Paley testified that Rowland "had a left rotator cuff tear before 2015. * * * He explained that he made this diagnosis based upon the fact that she fell in 2011, and her subjective and objective findings thereafter." DPS asserted that "[c]ritically, Dr. Paley was asked whether there was objective evidence *of a rotator cuff tear*, but he was never asked if there was objective evidence of a *substantial aggravation* of the tear as required by Ohio law. R.C. 4123.01(C)(4)." DPS argued that "since Dr. Paley did not know or utilize the correct standard for substantial aggravation, his testimony is unreliable and must be excluded." According to DPS, "since Dr. Paley failed to identify the objective diagnostic findings, objective clinical findings, or objective test results that support the allowance of the tear by way of substantial aggravation, his opinion is legally insufficient and must be barred."

**{¶ 5}** DPS asserted that Paley defined "substantial aggravation" as " 'a condition was preexisting * * * and that it was made worse by a more recent injury.' " DPS asserted

that after "the enactment of Senate Bill 7 in 2006, however, a mere worsening of a preexisting condition is <u>not</u> sufficient to support a claim by way of substantial aggravation." DPS asserted that R.C. 4123.01(C)(4) "now requires that an aggravation of a pre-existing condition must be substantial both in the sense of being considerable and in the sense of being firmly established through the presentation of objective evidence." DPS noted that the Ohio Jury Instructions define substantial aggravation as " 'major or significant, not trifling or small.' " DPS asserted that "after giving a <u>wrong</u> definition, Dr. Paley quizzically asked opposing counsel if he was correct! * * * His question confirms his uncertainty and undermines all of his opinions."

{¶ 6} DPS asserted that "post-injury objective evidence revealing the existence of a pre-existing condition is not sufficient to prove substantial aggravation. * * * The testing must do more than simply reveal the existence of pre-existing condition and provide an explanation for current symptoms. The testing must establish that the condition was substantially aggravated by the injury." According to DPS, "[w]ithout referencing any <u>objective</u> findings as required by statute, Dr. Paley opines that [Rowland] had a small tear before the 2015 fall, and larger tear thereafter." DPS asserted that "objective evidence that a condition exists is not evidence that the condition was substantially aggravated." DPS argued that "Dr. Paley's opinion is based on the definition of aggravation that existed before 2006."

{¶ 7} Rowland responded to DPS' motion on October 20, 2016. She asserted that "Dr. Paley is not a lawyer and is not required to utilize the legalese [DPS] sought to elicit during Dr. Paley's testimony. Further, failure to utilize the buzz words DPS relies so heavily upon in their Motion, does not, as asserted by DPS, call Dr. Paley's entire medical

opinion into question." Rowland asserted that "the MRI performed after the January 14, 2015 injury is sufficient objective diagnostic testing to support a finding of substantial aggravation." Rowland argued that "not only did Dr. Paley testify to a substantial aggravation, but he provided a full history of a pre-existing condition and objective documentation of a substantial aggravation post-injury." She argued that she "was suffering from a small pre-existing rotator cuff tear and actually was seeking treatment for same just a month prior to the 2015 work injury." She asserted that she "still required ongoing treatment, however, she was not a surgical candidate and was able to work. The January 2015 work related injury resulted in a substantial aggravation of that tear, rendering Ms. Rowland unable to work and making her a surgical candidate." Rowland asserted that Paley's testimony "provides ample evidence of a pre-existing rotator cuff tear that was substantially aggravated as documented by objective diagnostic testing."

{¶ 8} DPS replied to Rowland's memorandum in opposition on November 4, 2016. According to DPS, Rowland "utterly fails to address the undisputed fact that Dr. Paley incorrectly defined the substantial aggravation standard as a pre-existing condition that was simply 'made worse by a more recent injury.' * * * Dr. Paley's definition was specifically overturned by Senate Bill 7 a decade ago." DPS asserted that "Dr. Paley's testimony cannot possibly be deemed reliable pursuant to Ohio R. Evid. 702 since he used an outdated legal standard." DPS asserted that it "can certainly be argued that [Rowland] simply had the surgery that she needed all along for her pre-existing tear after she obtained an MRI. Surgery, in and of itself, is not objective evidence that her prior condition was substantially worsened." DPS asserted that "Dr. Paley was not specifically asked during his deposition to identify the objective findings that support a substantial

aggravation of a pre-existing tear." According to DPS, Rowland "now points solely to the post-injury MRI, surgery and her alleged inability to work as the 'objective findings' supporting her substantial aggravation claim."

{¶ 9} Rowland filed a Sur Reply on November 14, 2016. She asserted that she "provided ample documentation and expert testimony of her treatment and symptoms preceding the injury. * * * The Plaintiff * * * provided the objective diagnostic testing, that in conjunction with her prior symptoms, signs, treatment and diagnosis established the substantial aggravation."

{¶ 10} On December 7, 2016, the trial court sustained DPS' motion in limine. The court noted that "Paley stated on May 12, 2014 and November 19, 2014 that [Rowland] had a left rotator cuff tear and recommended an MRI, which [Rowland] did not do." Regarding DPS' assertion that Paley did not know or utilize the correct standard for substantial aggravation, the court indicated that it "does not find Paley's stated definition of 'substantial aggravation' to be troubling. Paley is not a lawyer, and his mischaracterization of the statutory definition would be of no consequence if Paley had thereafter me[t] the statutory requirements." The court indicated that "Paley, however, did not set forth any objective diagnostic findings, objective clinical findings, or objective test results that support a substantial aggravation of an existing tear." The court found that when "asked specifically about objective evidence, the question only related to a tear and not a substantial aggravation of an existing tear. Further, Paley failed to cite to objective diagnostic evidence showing such aggravation. Although a pre-injury MRI was not required as objective evidence, post-injury testing must do more than show an injury." According to the court, post-injury "testing must demonstrate that a pre-existing injury was

substantially aggravated. In the case at bar, there is no objective evidence or testimony regarding objective evidence that shows a substantial aggravation."

{¶ 11} On December 20, 2016, DPS filed a motion for leave to file a motion for summary judgment, as well as its summary judgment motion. DPS asserted that "in order to meet her burden of proof in this case, [Rowland] must present expert testimony supporting her position that she sustained a substantial aggravation of her pre-existing supraspinatus tendon tear in the course of, and arising out of, her employment with DPS on January 14, 2015. This Court, however, has excluded the testimony of her sole expert." DPS asserted that as "a result, reasonable minds can only conclude that [DPS] is entitled to Summary Judgment as a matter of law."

{¶ 12} Rowland responded to the motion on December 22, 2016. Rowland asserted that the trial court's decision on DPS' motion in limine was a four page decision by the Court that:

1. Contained absolutely no citation to any case law;

2. Contained absolutely no citation to any regulation, statute or code other than reference to the definition of injury;

3. Was devoid of any legal support;

4. Relied upon quoted testimony from the expert sought to be excluded, editing and abridging the testimony to exclude pertinent, relevant testimony.

{¶ 13} Rowland asserted that Paley testified that "Ms. Rowland suffered from a small tear in 2011 that got better and allowed her to return to work. * * * Ms. Rowland then suffered a major injury in January 2015 which resulted in a full blown tear to the same shoulder necessitating surgery. * * * The January 2015 tear * * * was also confirmed and

diagnosed through objective MRI findings." Rowland sought reversal of the court's ruling on DPS' motion in limine.

{¶ 14} Rowland asserted that under "established Ohio law, to establish a substantial aggravation of a preexisting injury there must be admissible, expert medical testimony that the injured worker suffered an injury." According to Rowland, "courts have interpreted R.C. 4123.01(C) and held that post-injury objective evidence, combined with subjective complaints is 'ample evidence' to establish a substantial aggravation." Rowland asserted that "case law makes clear that to establish a substantial aggravation, the claimant must provide sufficient documentation of a preexisting injury in tandem with objective diagnostic findings, objective clinical findings or objective test results of the substantial aggravation." She argued that Paley's testimony, "as to his ongoing treatment of Ms. Rowland's left shoulder injury dating back to 2011, provided ample evidence of a preexisting condition * * * ." Rowland argued that "Dr. Paley provided more than ample testimony of a substantial aggravation." She asserted that the "objective testing was in the form of an MRI performed in March 2015 that showed a full thickness tear of the rotator cuff. * * * Consequently, Dr. Paley's testimony is in accordance with established case laws." Rowland asserted that the exclusion of Paley's testimony "was reversible error," and that without the exclusion of the testimony, "a genuine issue of material fact exists precluding summary judgment."

{¶ 15} DPS replied to Rowland's response on December 28, 2016. According to DPS, Rowland conceded that summary judgment is appropriate if Paley's testimony is excluded. DPS asserted that instead "of filing affidavits or other evidence to place in issue the facts alleged by DPS, [Rowland] instead challenges this Court's ruling on DPS's

Motion in Limine. [Rowland] is essentially using her Response as an avenue to relitigate the issues already decided by this Court." According to DPS, a "more appropriate avenue for this argument would have been to file a motion to reconsider." DPS asserted that even if Rowland could relitigate the motion in limine, "she again fails to produce any testimony from Dr. Paley mentioning any objective diagnostic findings, objective clinical findings or objective test results to support his opinion that the pre-existing tear was substantially aggravated."

{¶ 16} In its decision sustaining DPS' motion for summary judgment, the court initially reconsidered its decision on DPS' motion in limine, and it noted that Paley testified that substantial aggravation meant " 'that a condition was pre-existing * * * and that it was made worse by a more recent injury. Is that correct?' " After noting that in sustaining DPS' motion in limine, the court found that since Paley is not a lawyer, his mischaracterization of the standard would be of no consequence if he thereafter met the statutory definition, the court further noted that "this determination * * * was too generous to [Rowland]." The court noted that "while Paley asked Plaintiff's counsel if his definition was correct, Plaintiff's counsel responded yes and did not correct Paley." The court noted that "[u]pon reconsideration of its decision with respect to DPS' motion in limine, the Court finds that Paley did not use the correct standard when testifying as to a 'substantial aggravation,' and that such failure affected his testimony." According to the court, "[w]ithout an understanding of the statutory definition of 'substantial aggravation,' * * * Paley's determination that the worsening was substantial does not satisfy O.R.C. Section 4123.01(C)."

{¶ 17} The court further determined that more "importantly, however, there is no

objective evidence of a substantial aggravation. Paley did not set forth any objective diagnostic findings, objective clinical findings, or objective test results that support a substantial aggravation of an existing tear." According to the court, when "asked specifically about objective evidence, the question *only related to a tear and not a substantial aggravation of an existing tear.* Further, Paley fails to cite to objective diagnostic evidence showing such aggravation." The court indicated that "[p]ost-injury testing must demonstrate that a pre-existing injury was substantially aggravated." The court affirmed its decision on the motion in limine "with the modification that Paley did not use the correct statutory standard under * * * [R.C.] 4123.01(C) to establish a 'substantial aggravation' of the 'left shoulder supraspinatus tendon tear.' "

{¶ 18} Regarding DPS' motion for summary judgment, the court found that since Rowland's "injury is not observable by the trier of fact, expert testimony must establish the cause of her injury. In this case, the Court has excluded the testimony of Plaintiff's only expert on this issue." As a result, the court concluded that "no genuine issue of material fact remains for trial * * *."

{¶ 19} Rowland asserts two assignments of error herein which we will consider together. They are as follows:

THE TRIAL COURT ERRED WHEN IT FOUND THAT PLAINTIFF'S EXPERT DR. PALEY ALLEGEDLY MISCHARACTERIZED THE STATUTORY DEFINTION OF SUBSTANTIAL AGGRAVATION RENDERING HIS TESTIMONY INSUFFICIENT UNDER R.C. 4123.01,

And,

THE TRIAL COURT ERRED WHEN IT DETERMINED THAT DR.

PALEY FAILED TO PROVIDE OBJECTIVE EVIDENCE OF A SUBSTANTIAL AGGRAVATION.

{¶ 20} Regarding the trial court's determination that "Dr. Paley's response on cross examination as to the statutory definition of 'substantial aggravation' discredited his expert testimony," Rowland asserts that this "unsupported contention that a medical expert must recite statutory language to qualify his testimony is patently false. Dr. Paley's response as to the meaning of substantial aggravation may have bearing on his credibility, but does not limit the admissibility of his testimony." Rowland asserts that "[m]ost importantly, the Court held again [that] Dr. Paley failed to provide objective evidence of a substantial aggravation. This holding is erroneous. Dr. Paley's testimony is crystal clear that objective evidence was utilized to confirm a full blown rotator cuff tear and it was confirmed by surgery." Rowland argues that "Dr. Paley's testimony was erroneously excluded, and without the exclusion there exists a genuine issue of material fact."

{¶ 21} Rowland argues that "while the existence of a pre-existing condition and objective evidence of a substantial aggravation are necessary, case law does not require experts must utilize specific legalese when testifying regarding same." Rowland asserts that the court's determination that "without an understanding of the statutory definition of 'substantial aggravation' Dr. Paley's testimony does not meet the requirements of R.C. 4123.01(C)" is "unsupported and without merit." Rowland argues that the "fact that Dr. Paley made a rhetorical comment on cross examination has nothing to do with and does not diminish the expert testimony he gave on direct."

{¶ 22} Rowland asserts that her claim "is a textbook example of a substantial

aggravation claim." She asserts that she presented the "testimony of her treating physician stating that his long term treatment of the Plaintiff prior to the January 2015 work related injury substantiated a diagnosis of a small rotator cuff tear." At the time, Rowland stated that she "was not a surgical candidate and was improving." She argues that after her fall in 2015, "the objective evidence was an MRI that showed a full blown tear not present prior to January 2015 * * *."

{¶ 23} DPS responds that the "issue is whether Dr. Paley's incorrect understanding of the definition of 'substantial aggravation' destroys the reliability of his opinion." According to DPS, "after giving a wrong definition, Dr. Paley quizzically asked opposing counsel if he was correct. * * * His question confirms his uncertainty and undermines all of his opinions." DPS asserts that "Dr. Paley's testimony was given based upon a faulty understanding of the current 'substantial aggravation' standard, namely the pre-Senate Bill 7 requirements to prove an aggravation."

{¶ 24} DPS asserts that "the issue is not whether there is sufficient pre-injury documentation of a rotator cuff tear. Indeed, it is undisputed that Appellant had a tear. The issue is whether Dr. Paley identified objective evidence of a *substantial aggravation* of the pre-injury rotator cuff tear." DPS asserts that Paley's testimony "clearly fails to set forth objective evidence of a substantial aggravation of a previously diagnosed tear. Dr. Paley was only asked whether there was objective evidence of a rotator cuff tear. He was never asked if there was objective evidence of a *substantial aggravation* of the tear as required by law." According to DPS, post-injury testing "must do more than show an injury. It must also demonstrate that a pre-existing injury was substantially aggravated."

{¶ 25} In Reply, Rowland asserts that DPS "is conflating the admissibility of expert

medical testimony with an issue over the weight to be given said testimony." She asserts that "Dr. Paley's testimony taken as a whole provides ample, admissible expert medical testimony of substantial aggravation in this matter." Rowland argues that providing the "proper definition of substantial aggravation is the province of the Court." She asserts that the First District's holding in *Pflanz v. Pilkington LOF*, 1st Dist. Hamilton No. C-100574, 2011-Ohio-2670, "is determinative in this present matter." Therein, the chiropractor who treated Thomas Pflanz for back pain before and after his workplace injury at Pilkington LOF opined that Pflanz's post-injury MRI and other post-injury range of motion tests demonstrated that Pflanz's workplace injury substantially aggravated his pre-existing back problems. The court held that the "word 'substantial' has multiple meanings, including 'considerable in amount, value or the like,' and '[f]irmly established; solidly based.' " *Id.*, ¶ 17. It concluded that "we find no ambiguity in the statute despite these distinct meanings, because the statutory language indicates that the claimant must demonstrate 'substantial' aggravation in both senses of the word." *Id.* The First District held that Pflanz "provided ample [objective and subjective] evidence" that his "workplace injury had substantially aggravated his preexisting back conditions." *Id.*, ¶ 20.

{¶ 26} "A trial court has broad discretion in determining whether to admit or exclude expert testimony, and thus, we will not reverse its decision absent an abuse of discretion. *State v. Jones* (2000), 90 Ohio St.3d 403, 414, 739 N.E.2d 300." *Darden v. Cooper Power Tools, Inc.*, 2d Dist. Montgomery No. 20190, 2004-Ohio-5277, ¶ 24. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." (Citation omitted.) *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "It is to be

expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.*

**{¶ 27}** As this Court has previously noted, "[a] claimant must establish an injury to participate in Ohio's workers' compensation system. * * *." *Harrison v. Panera, L.L.C.*, 2d Dist. Montgomery No. 25626, 2013-Ohio-5338, ¶ 23. R.C. 4123.01(C)(4) defines injury as follows:

(C) "Injury" includes any injury, whether caused by external accidental means or accidental in character and result, received in the course of, and arising out of, the injured employee's employment. "Injury" does not include:

\* \* \*

(4) A condition that pre-existed an injury unless that pre-existing condition is substantially aggravated by the injury. Such a substantial aggravation must be documented by objective diagnostic findings, objective clinical findings, or objective test results. Subjective complaints may be evidence of such a substantial aggravation. However, subjective complaints without objective diagnostic findings, objective clinical findings, or objective test results are insufficient to substantiate a substantial aggravation.

**{¶ 28}** As this Court recently noted:

Subdivision (C)(4) was added to R.C. 4123.01 in 2006. Prior to that time, the Supreme Court of Ohio had held that claimants were not required to prove that an aggravation was substantial in order to recover. *See*

*Pflanz v. Pilkington LOF*, 1st Dist. Hamilton No. C-100574, 2011-Ohio-2670, ¶ 13, citing *Schell v. Glove Trucking, Inc.*, 48 Ohio St.3d 1, 548 N.E.2d 920 (1990). In *Pflanz*, the court concluded that as a result of the amendment, "to be compensable, the aggravation of a preexisting condition must be substantial both in the sense of being considerable and in the sense of being firmly established through the presentation of objective evidence." *Id.* at ¶ 18. * * *

*Woods v. Bureau of Workers' Compensation*, 2016-Ohio-237, 57 N.E.3d 468, ¶ 17 (2d Dist.).

{¶ 29} Dr. Paley testified that he is a board certified orthopedic surgeon, and that he completed a shoulder and knee fellowship at the University of Tennessee after his residency. He testified that in 23 years of private practice, he has performed between two and three thousand rotator cuff surgeries. Paley testified that a "rotator cuff tear can occur when the tissue is overloaded. That can be through attrition in older people, that can be through repetitive motion in athletes, that can be repetitive motion in the workforce. And it could be overload as a result of a sudden forceful exertion such as a fall." Paley testified that he treated Rowland for a left shoulder sprain in 2011, after she fell at work. He stated that an MRI was not done (notably DPS refused to pay for one), and that he believed Rowland had a rotator cuff tear at the time. When asked the basis for his opinion, Paley testified as follows:

> The persistent pain. There is weakness. There is the objective findings associated with particular motions that we do to produce pain that would be elicited if someone tore a rotator cuff. I consider those objective.

There is the failure to improve 100 percent, so we have this chronic sort of nagging thing that typically a tendonitis or bursitis would get better with a cortisone shot, that sort of thing. So, people with some of these mechanical issues like a cuff tear or a tendon tear don't always get completely better.

{¶ 30} Paley testified that he treated Rowland on February 9, 2015 after she fell on the ice at work on January 14, 2015. The following exchange occurred:

Q. * * * Did you do a physical examination of her at that time, Doctor?

A. Yes.

Q. And what was that physical examination, what did it consist of and what were the results?

* * *

A. She said that she had made some gradual improvement with therapy, but she continued to have a lot of pain with her most painful complaint being the left shoulder * * *.

* * *

We talked about her past surgical history. We documented that. That she's a non-smoker, which is important to me as a surgeon, especially with rotator cuff pathology. * * * We examined the left shoulder, she had very protected or guarded range of motion. She didn't want to move the shoulder. She had difficulty with any overhead activity. Active, passive motion, where we have the patient actually - - we assist the patient lifting

the arm.   It was fairly limited to about 130 degrees.

There was significant pain with what we call the Neer and Hawkins impingement maneuvers, and those procedures are designed to elicit pain. The arm is actually brought up into abduction and internally rotated, and people with a rotator cuff tear or significant cuff pathology will have a lot of pain.

Q.   Did she?

A.   She did.   There was some crepitations with passive range of motion.   Most significant was the apprehension.   She was very apprehensive.   She had diminished strength and there was tenderness over the lateral aspect of the left shoulder around the acromial border.   And she had some posterior trigger points over the trapezius, which was uncomfortable.   We examined her right shoulder.   There was a well healed incision from a prior rotator cuff surgery and so forth.

Q.   What was the next thing you did, Doctor?

* * *

A.   * * * We recommended x-rays.   Both of her shoulders were radiographed.   * * * There was some sclerosing or changes over the rotator cuff footprint over the greater tuberosity.   * * *

* * *

Q.   What's the next thing you did, Doctor, as to the left shoulder?

A.   We recommended ongoing therapy.   We felt that what we found on the examination was consistent with her traumatic fall.   We requested

additional physical therapy, predominantly for the shoulders. We said that the healing process takes about six to eight weeks and we started her on medications and suggested that she come back and see us in two or three weeks' time to see how she's doing.

Q.   Did you arrive at a diagnosis of the left shoulder?

A.   Yes, we did.   We, we gave her the allowed diagnosis under our assessment for what she was actually allowed for, a right shoulder contusion.

* * *

Q.   Was there a suspicion of a rotator cuff tear?

A.   A very high suspicion of a rotator cuff tear.

Q.   Why is that?

A.   Well, it's the loss of function, it's the provocative maneuvers, it's the diminished strength, it's the sclerosing over the footprint.   It's the previous and present pain, now worsening, with greater disability.   So, yes, I mean, all typical and classic for a rotator cuff injury.

Q.   When is the next time that you saw Ms. Rowland, Doctor?

A.   February 23.

Q.   What happened at that visit?

A.   Okay, she was here for a follow-up evaluation of all of her issues. She had completed her physical therapy at Concentra.   Was waiting for additional authorization for therapy.   Most significantly was complaining of ongoing left shoulder pain and weakness * * *.

* * *  The left shoulder, again, significant guarding or loss of motion. Forward flexion of only 90 degrees was noted.   She had a fairly weak and painful, what we call a drop arm maneuver on the left side.

Q.   What's that, Doctor?

A.   Drop arm is a very objective exam where we actually bring the arm up for the patient.   So, we bring the arm up (indicating).   And we ask the patient to hold it.   And then we have them bring it down.   And when they try to bring it down, the arm just drops.   And the patient is unable to hold the arm up and to bring it down in a slow guided manner.   That's pretty pathognomonic for a rotator cuff tear.   Pathognomonic meaning highly indicative of.

* * *

Q.   What is an MRI?

A.   An MRI is a special x-ray study.   It's also known as a magnetic resonance imaging study.   And that allows us to see the soft tissue.   It's very good for soft tissue pathology such as tears.   It's especially good for, when done properly, good for rotator cuffs, good for anterior cruciate ligament disruptions. * * *

Q.   Did she eventually have an MRI?

A.   She did.

Q.   When was that done, Doctor?

A. * * * That MRI was done March 24th, 2015. So, the conclusion was, one centimeter high grade partial versus full thickness tear, the

supraspinatus high grade is * * * essentially the same as a full thickness tear, meaning a dysfunctional or non-functional rotator cuff.

Q.   And I take it you would have also looked at that MRI?

A.   Yes.

Q.   And confirmed that?

A.   Yes.

* * *

Q.   How do you fix somebody who has that issue?

A.   This is a surgical consideration at this point.   The - - the rotator cuff is kind of like a spring.   And it's spring loaded.   And so, once it's attached here and then rips, it pulls back.   And so, it's just the nature of the design.   And under that tension, that's what gives the MRI [sic] its ability to lift your arm under power.   That's why she was having so much trouble lifting the arm, was [sic] she wasn't able to generate enough force because it was torn.   So, you basically have to respring it or put the spring back to where it's anchored to.

* * *

Q.   Now, her prior rotator cuff tear from 2011, that was not a surgical rotator cuff tear?

A.   No.   She was improving.   I mean, you can't argue with improvement.   And there's a segment of the population, or a subset of the population of people who have, you know, rotator cuff tears that get better. They, they do better enough to function.   And if they function, then you

leave them be and, you know, you only operate on them if it worsens over the course of time.

Q. Now, this MRI doesn't show an improving rotator cuff tear?

A. No. In my opinion, it shows a rotator cuff tear that is not improving, it's present and needs to be fixed.

Q. Can that be treated conservatively, that kind of rotator cuff tear that's on the MRI?

A. I think that's a big enough tear where she has enough problems, it's worsened, in my opinion it will continue to worsen, which is typically the history of these, they get bigger in this younger population. I mean, she's only 48. Okay? She's employable, she works. It's, these are the people that, you know, you have to fix.

Q. This - - if a person with that MRI presents in your office, is that the standard of care, in other words, you need surgery for this?

A. Well, it's not the standard of care just from my office, I think it's the national standard of care.

{¶ 31} Paley testified that he performed surgery on Rowland on September 22, 2015 to repair her torn rotator cuff. He stated she completed physical therapy and returned to work. The following exchange occurred at the end of Paley's direct testimony:

Q. * * * Dr. Paley, based on the history that you took from Ms. Rowland, your care and treatment of Ms. Rowland - -

A. Uh-huh.

Q. - - and your education, training and experience as a board certified orthopedic surgeon, do you have an opinion to a reasonable medical certainty as to whether or not the, the fall that she described to you in the history, as occurring [o]n January 14th, 2015, substantially aggravated her preexisting left rotator cuff tear from 2011 that you diagnosed?

A. I do.

* * *

Q. What is your opinion, Doctor?

* * *

A. My opinion, yes, is that she did substantially aggravate this preexisting rotator cuff disease, this tear.

* * *

Q. And what was the event that substantially aggravated the preexisting left shoulder rotator cuff tear?

* * *

THE WITNESS: Well, it was the January 15th fall on the ice.

* * *

Q. What medical analysis do you have that substantiates that opinion, Doctor?

* * *

THE WITNESS: * * * My opinion is predicated on the fact that she had a preexisting issue. This issue was painful. It didn't immediately

respond to supportive care, which we consider, such as medications, physical therapy, injections, things along that line.

We attempted to get an MRI to confirm our suspicions, but that was never approved. But nonetheless, we don't always need MRI's to diagnose rotator cuff tears. The history of her injury was consistent with that back from the 2011 injury. She got better, like many people get better, to a point. But she was, she continued to be seen for this problem.

If I'm not mistaken, she was seen just the month prior to this with ongoing shoulder pain. Classic and typical of someone who had ongoing pathology, probably from a rotator cuff tear.

So, given the weakness, the continued complaints, given the fact that she had sclerosing or changes over the rotator cuff insertional site on her x-rays, then she had a rotator cuff tear. I don't think that there's any surgeon who practices and does rotator cuff surgery that would argue that, that she does not have a preexisting issue.

Now, fast forward to the next date, 2015, January, she falls again. A similar mechanism of injury, already damaged tissue, not as good as the original tissue, and she now completely tears the rotator cuff at this point. To the point where there is no getting better. There is a percentage of people, like I alluded to earlier, that with smaller tears they can get better to a point where they can go back to work effectively. This was one of them. People who typically go back to overhead repetitive activity, they're not in that subset because they tend to worsen.

Diane Rowland, as a bus driver for Dayton Public Schools, was able to function and to do the things that she, were required of her to do her job. And that's fine, all right? But with the fall, I think that that was the, that was the thing that sealed the deal for her, was that she went on to tear the cuff.

* * *

Q. And the fall you're referring to as the aggravating event is the January 14th, 2015 fall?

A. That's the one that worsened her problem, yes.

Q. And that worsening, would you say that that worsening was a substantial worsening from the preexisting rotator cuff tear you diagnosed in 2011?

* * *

A. Absolutely.

* * *

Q. And is that opinion to a reasonable degree of - -is that opinion to a reasonable medical certainty?

* * *

A. I think it's a hundred percent medical certainty, in my opinion.

* * *

Q. And was there objective evidence of a rotator cuff tear in 2015?

A. Yes.

Q. * * * And what was there?

A. Well, there was the MRI and there was the operative procedure.

Q.   * * * Have all of your opinions been to a reasonable medical certainty, Doctor?

A.   Yes.

{¶ 32} The following exchange occurred on cross-examination:

Q.   I would like to show you your office note that's dated April 13th of 2015.   And is that, in fact, your office note?

A.   Yes, it is.

Q.   * * * And isn't it true, and this note again, April 13, would be about what four months or so after this January of 2015 injury that we're talking about?

A.   Yes.   This clearly is the issue associated with her shoulder.

Q.   Okay. And - -

A.   I think she would benefit from this, and clearly this is a direct and proximate result of her injury, okay?

Q.   * * * And just to make sure for the jury that my question is clear, your opinion at that time, as documented by this note, does in fact say that this rotator cuff tear is a, quote - - in fact it says, quote, clearly this is a direct and proximate result of her injury - -

MR. PLUNKETT:   Objection, you're misleading it.   This note does not say that.

THE WITNESS:   I agree, it does not say that.

* * *

BY MS. BACH:

Q. Doctor, why don't you read the paragraph that says disposition and plans at the bottom.

A. I have made recommendations for surgical intervention. This is clearly the issue associated with her shoulder. I think she would benefit from this and clearly this is a direct and proximate result of her injury. The larger tear is the result of the more recent fall, okay? You can mince words all you want, all right? But the point is is [sic] that you cannot just erase the past, that she didn't have a previous problem with her shoulder, that we were suspicious of it was a rotator cuff.

That cuff has never - - that cuff tear has never gone away, all right? Now she's fallen and it's larger and it's bigger. And it's, this is a result of that.

Q. * * * But Doctor, you would agree that you can't have a rotator cuff tear that is directly caused by one injury and also substantially aggravated by the same injury, correct?

A. Why not?

Q. So, you believed that you can render an opinion to a reasonable degree - -

MR. PLUNKETT: Objection.

BY MS. BACH:

Q. - - of medical certainty - -

MR. PLUNKETT: He's not saying that.

THE WITNESS: I believe - -

MS. BACH:   Well, why don't you let him answer my question and I'd like to finish the question.

THE WITNESS:   I believe that you can have a small tear that's symptomatic, allowing a patient to work.   And it's still, by definition, a tear. And then you could fall again and cause a larger tear.

BY MS. BACH:   * * * Thank you, but that's not my question.

A.   Well, that's the only way I know how to answer it.   I'm sorry.

Q.   Let me, let me just finish the question - -

A.   Okay.

Q. - - so we can find out what your opinion is, please.   My question is, isn't it true that you cannot testify to a reasonable degree of medical probability that a rotator cuff tear is directly caused and also substantially aggravated by the same incident?

MR. PLUNKETT:   I'm going to object.   You're asking the doctor to testify on a legal standard.   We agree a doctor in the state of Ohio cannot render that kind of opinion and he has not done so.   Objection, move to strike.

MS. BACH:   And I would like to hear the doctor's answer to the question, please.

MR. PLUNKETT:   Objection.

THE WITNESS:   Okay, well, I'm not an attorney, okay?   And this is sometimes the problem, and sometimes why we have to come here to these depositions, I guess to iron these things out.   But it is my opinion that this

is a result, and that probably would have been a better word to use, a result of her fall, at that time, in January of 2015, on the ice. Okay?

And I probably should have said something to the effect that she made her tear bigger and that she had a previous rotator cuff issue that was made worse. I mean, would that have made it better? I mean, you've got to understand, I don't have a dog in this fight. You know, I'm here to fix her shoulder and that's it. So you know, I'm here to testify to the honesty of it.

BY MS. BACH:

Q. Well, Doctor, in all fairness, if her claim is allowed for certain medical conditions, then you can get paid for treating her for those conditions, correct?

A. I think, I don't know if we have any bills with her. I don't know.

Q. Again, it would be helpful if you would listen to my question and answer the question that I'm asking you. As a general principle, isn't it true that if her Workers' Compensation claim is allowed for a rotator cuff tear, you can treat her for that condition and your bills will be paid under Workers' Compensation?

A. Well, typically if a claim is allowed, then yes - -

Q. Okay.

A. - - you know, the practice gets paid for its treatment.

Q. All right.

A. Okay? But, you know, like I said, I'm not an attorney, and yes, okay, it is, it is difficult sometimes to get the legalese correct.

Q. All right. But you understand the concept of substantial aggravation, correct?

A. Yes.

Q. What is substantial aggravation?

A. Well, that a condition was preexisting, according to our discussion today, and that it was made worse by a more recent injury. Is that correct?

MR. PLUNKETT: Yes, that's correct.

{¶ 33} The following exchange occurred regarding Paley's office note on redirect examination:

Q. Doctor, I want to go back and talk about one of the exhibits that Ms. Bach showed you. And this is the exhibit about your note, okay?

A. Uh-huh.

Q. - - okay? So, Exhibit B says, and I'm reading from the, the bottom of this exhibit. It says, quote, I have made recommendations for surgical intervention?

A. Yes.

Q. And is that the surgery that you performed on Ms. Rowland?

A. It is.

Q. And then it says, this is - - this is clearly the issue associated with her shoulder.

A. Yes.

Q. And then it goes on to say, I think she would benefit from this.

And clearly, this is a direct and proximate result of her injury. The surgery directly and proximately resulted from the substantial aggravation of the preexisting rotator cuff tear?

* * *

THE WITNESS: The surgery is - - yes.

Q. * * * In other words, before, I mean, before 2015, was there a surgery that was recommended and done to the rotator cuff tear?

A. There was no surgery done to the left shoulder.

Q. * * * And is there anything in this paragraph that Ms. Bach asked you that, where you say that the rotator cuff tear was directly caused by the fall? This says the surgery was caused, necessitated by the fall.

A. Yes.

* * *

Q. * * * Doctor, the rotator cuff tear, okay - -

A. Uh-huh.

Q. - - is there anything in this paragraph that talks about the rotator cuff tear being directly related or is it the surgery that you're talking about in this paragraph?

A. No, it's the surgery that - - she had the surgery as a result of her injury.

Q. Agreed.

A. Okay.

Q. Okay.

A. * * * And so, the surgery's a direct and proximate result, if that's how you want to say it, okay? That's how I put it in there. And so, there it is. I still maintain that it's a substantial aggravation.

{¶ 34} As noted above, in sustaining DPS' motion in limine, the trial court initially indicated that it "does not find Paley's stated definition of 'substantial aggravation' to be troubling. Paley is not a lawyer, and his mischaracterization of the statutory definition would be of no consequence if Paley had thereafter me[t] the statutory requirements." In granting DPS's motion for summary judgment however, the court found, "[u]pon reconsideration of its decision with respect to DPS' motion in limine, the Court finds that Paley did not use the correct standard when testifying to a 'substantial aggravation,' and that such failure affected his testimony." The court found that "[w]ithout an understanding of the statutory definition of 'substantial aggravation,' however, Paley's determination that the worsening was substantial does not satisfy O.R.C. Section 4123.01(C)." Finally, the court concluded that "there is no objective evidence of a substantial aggravation. Paley did not set forth any objective diagnostic findings, objective clinical findings, or objective test results that support a substantial aggravation of an existing tear."

{¶ 35} We disagree. We initially note that while "injury" is defined as set forth above, there is not a "statutory definition" of "substantial aggravation." As did the First District in *Pflanz,* ¶ 17, (and the Eighth District in *Gardi v. Bd. of Educ. of the Lakewood School District*, 8th Dist. Cuyahoga No. 99414, 2013-Ohio-3436, ¶ 12), we find the language of R.C. 4123.01(C)(4) to be unambiguous and clear. As this Court noted in *Woods*, pursuant to *Pflanz*, " 'to be compensable, the aggravation of a preexisting

condition must be substantial both in the sense of being considerable and in the sense of being firmly established through the presentation of objective evidence.' " *Woods*, ¶ 17.

**{¶ 36}** Dr. Paley opined that Rowland had a pre-existing rotator cuff tear in her left shoulder. Paley stated that her condition had improved "to a point," and she had returned to work at the time of her 2015 fall. Paley stated that when he examined Rowland on February 9, 2015, he observed "very protected or guarded range of motion," and that she "had difficulty with any overhead activity." He stated that he tested Rowland's "[a]ctive, passive motion, where we have the patient actually - - we assist the patient lifting the arm. It was fairly limited to about 130 degrees." He stated that he employed the "Neer and Hawkins impingement maneuvers," which are designed to "elicit pain," and he testified that Rowland experienced a lot of pain and "some crepitations with passive range of motion." Paley stated that Rowland exhibited significant apprehension and "diminished strength and there was tenderness over the lateral aspect of the left shoulder around the acromial border. And she had some posterior trigger points over the trapezius, which was uncomfortable."

**{¶ 37}** Paley testified that he ordered x-rays which revealed "sclerosing or changes over the rotator cuff footprint over the greater tuberosity." Paley stated that he recommended "ongoing therapy." He testified that he had a "very high degree of suspicion of a rotator cuff tear," based upon his observation of Rowland's "loss of function, it's the provocative maneuvers, it's the diminished strength, it's the slcerosing over the footprint * * * the previous and present history of ongoing pain, now worsening, with greater disability" which are "all typical and classic for a rotator cuff tear."

**{¶ 38}** Paley stated that he examined Rowland again on February 23, 2015. He

testified that he again observed "significant guarding or loss of motion. Forward flexion of only 90 degrees was noted." Paley stated that he performed "a very objective exam" called the "drop arm maneuver," and he stated that Rowland exhibited a "fairly weak and painful" maneuver. Paley testified that he ordered an MRI and that Rowland's March 24, 2015 exam revealed a "one centimeter high grade partial versus full thickness tear, * * * [which is] essentially the same as a full thickness tear, *meaning a dysfunctional or non-functional rotator cuff.*" (Emphasis added). Paley stated that the MRI revealed "why [Rowland] was having so much trouble lifting the arm," namely that "she wasn't able to generate enough force because it was torn." Paley stated that in contrast to Rowland's 2011 tear, which responded well enough to treatment to allow her to return to work, the MRI revealed a "rotator cuff tear that is not improving, it's present and needs to be fixed." Paley opined that the tear would continue to worsen if not repaired, and that the surgery further confirmed the presence of the tear, which he repaired.

{¶ 39} Paley opined that the January 14, 2015 fall substantially aggravated Rowland's preexisting 2011 rotator cuff tear, and we conclude that his testimony regarding Rowland's 2011 injury, and the objective range of motion tests he administered after her 2015 injury, and the MRI, is testimony sufficient to withstand the motion for summary judgment and allow a jury to determine whether Rowland suffered a substantial aggravation of a preexisting injury that is both considerable and firmly established through the presentation of objective evidence. Accordingly, we conclude that the trial court abused its discretion in determining that Paley's testimony was subject to exclusion. Rowland's assigned errors are sustained, the judgment of the trial court granting summary judgment in favor of DPS is reversed, and the matter is hereby remanded for

further proceedings consistent with this opinion.

. . . . . . . . . . . . .

HALL, P.J. and TUCKER, J., concur.

Copies mailed to:

Gary D. Plunkett
Rachel D. Siekman
David C. Korte
Michelle D. Bach
Joshua R. Lounsbury
Cheryl Nester
Hon. Barbara P. Gorman